UNITED STATES of America, Plaintiff,

v.

Elmer E. RODRIGUEZ a/k/a "Edgar", Helmer Mosquera, Milton Calderon, Felix Rengifo, Francis Scala a/k/a "Frankie" a/k/a "Frank", Leslie K. Grover, Harvey Brand a/k/a Harvey Arias, Patrick J. Scala a/k/a "Jay", James Malacaria, Rodney A. King, Javier Brand a/k/a Javier Arias, and Nelson Rodriguez, Defendants.

Crim. No. 84–407–C.

United States District Court, D. Massachusetts.

April 10, 1985.

Oliver C. Mitchell, Jr., U.S. Atty., for U.S.

Richard Gargiulo, Boston, Mass., for defendant Elmer Rodriguez.

Richard Gargiulo, Brian J. McMenimen, Gargiulo & McMenimen, Boston, Mass., for defendant Mosquera.

W.H. Underhill, Jr., Boston, Mass., for defendant Calderon.

James Michael Merberg, Law Offices of F. Lee Bailey, Boston, Mass., for defendant Rengifo.

Cornelius H. Kane, Boston, Mass., for defendant Francis Scala.

William F. York, Boston, Mass., for defendant Grover.

Judd Carhart, Carhart, Bonistalli & McCarthy, Boston, Mass., for defendant Harvey Brand.

Kevin J. O'Dea, Boston, Mass., for defendant Patrick Scala.

Paul W. Losordo, Quincy, Mass., for defendant Malacaria.

Kevin Glynn, Boston, Mass., for defendant King.

Edward Gargiulo, Boston, Mass., for defendant Javier Brand.

Thomas F. Heffernon, Salon, Heffernon & Shub, Boston, Mass., for defendant Nelson Rodriguez.

## MEMORANDUM

CAFFREY, Chief Judge.

This is a criminal case in which twelve defendants are accused of conspiracy to possess cocaine with intent to distribute and related offenses in a fifteen count indictment. The defendants have filed a multitude of motions to suppress evidence which motions may be broken down into three categories: evidence obtained through electronic surveillance, evidence seized pursuant to search warrants, and post-arrest statements. All of the motions are presently before the Court.

### ELECTRONIC SURVEILLANCE EVIDENCE

*Defendants E. Rodriguez, Mosquera, Calderon Grover, H. Brand, P. Scala, Malacaria, King, J. Brand, N. Rodriguez*

The above-named defendants have moved to suppress evidence obtained through electronic surveillance of communications made to and from a telephone numbered (617) 277–8290, and subscribed to by defendant Elmer Rodriguez. The Honorable David S. Nelson of this Court authorized such interceptions pursuant to 18 U.S.C. § 2518.

The first application for an order authorizing interception of wire communication was filed on October 2, 1984. A seventy-one paragraph affidavit by Special Agent John J. Hampe, Jr. of the Drug Enforcement Administration ("DEA") was also submitted in support of the application. The substance of the relevant facts recited in the affidavit is as follows.

Hampe, an 18-year DEA veteran and Massachusetts state and local police were

engaged in a joint investigation with which had focused on unlawful cocaine distribution activities involving several of the present defendants. During the course of the investigation several confidential informants ("CI") provided information as to the existence and structure of the cocaine distribution network. One of these informants has described Elmer Rodriguez as a seller of cocaine who transacts business over the telephone. Another CI has purchased cocaine from Rodriguez on two occasions under law enforcement surveillance. Both transactions were arranged by telephoning Rodriguez at (617) 277–8290. Visual surveillance of the Rodriguez residence revealed that Rodriguez left the house shortly after each call, went to a second location, then proceeded to the rendezvous to complete the sale. Two additional informants gave information as to Elmer Rodriguez' extensive involvement with cocaine distribution in the area, and also named several other participants.

The investigating officials attempted to use conventional methods to further the investigation. A DEA agent attempted to purchase cocaine from Elmer Rodriguez by telephoning (617)277–8290 on two occasions but this was unsuccessful. A Court authorized pen register was used to record telephone numbers dialed from Rodriguez' phone, but this, of course, did not identify the persons engaged in the conversation or its subject matter.

The affidavit recites a number of reasons why normal investigative techniques would be unlikely to yield further results. Elmer Rodriguez was known to keep the bulk of his cocaine at locations other than his home, and to make arrangements for pickup and delivery via telephone. Furthermore, an informant reported that Rodriguez would not sell cocaine to persons he did not know or trust. The informants refused to testify against Rodriguez even when offered relocation under the Witness Protection Program. Offers of immunity from prosecution were unlikely to succeed because several participants in the alleged conspiracy were related. Furthermore, those members of the organization trusted by Rodriguez appeared to be as culpable as he, and therefore inappropriate persons for a grant of immunity. Finally, the use of conventional search warrants would not identify all locations used by Rodriguez and his associates to store cocaine or identify all members of the group. The affiant concluded that, based on his experience, the interception of wire communications was "the only method of investigation likely to provide the quality and amount of evidence necessary to prosecute Rodriguez and his associates...."

The application for an order authorizing electronic surveillance was granted on October 2, 1984, and a 30-day order issued the same day. The intercepts began immediately and continued throughout October. Later in the month the Government made application for a second order authorizing interceptions beginning on October 31 and continuing for 30 days. The affidavit accompanying that application was again provided by Agent Hampe, and contains transcripts of previously intercepted conversations during which drug transactions were discussed. This affidavit recites that visual surveillance had become even less feasable because of the defendants' heightened concern about police activity. Hampe also describes in greater detail Rodriguez' complex movements which made it very unlikely that conventional methods would discover where his cocaine was stored, his source, and how he disposed of his sale proceeds.

The defendants move to suppress evidence obtained through the interception of communications on the Rodriguez phone on several grounds. They claim that the statute pursuant to which the wiretaps were authorized, 18 U.S.C. § 2518, is unconstitutional; that the affidavit is insufficient to satisfy the requirements of 18 U.S.C. § 2518(10)(a) and the Fourth Amendment; that the orders authorizing the intercept are improper and insufficient, that the interceptions were not made in accordance with the order of authorization; that the interceptions were not properly minimized, and that inventories were not served upon

the defendants within 90 days as required by 18 U.S.C. § 2518(8)(d).

Several of these contentions may be dealt with summarily. To begin with, the statute has survived numerous constitutional challenges. *See United States v. Southard,* 700 F.2d 1, 27 (1st Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 89, 78 L.Ed.2d 97 (1984) and cases cited therein at n. 35. It is unnecessary to belabor that issue at this juncture. As to defendants' other contentions, I find and rule that the affidavits show that there was probable cause to believe that named and unnamed individuals had committed and were committing offenses enumerated in 18 U.S.C. § 2516; that there was probable cause to believe that particular communications concerning these offenses could and would be obtained through the interception; and that the telephone to be intercepted is listed in the name of Elmer Rodriguez. Additionally, I find and rule that the surveillance orders issued meet the requirements of 18 U.S.C. § 2518(4) in describing the identities of persons and location of communications to be intercepted as well as the identity of the agencies authorized to make these interceptions and the period of time during which the interceptions are authorized. I further find that inventories of the intercept were served upon each of the defendants in accordance with § 2518(8)(d).

There remain two grounds for suppression of the wiretap evidence which require more detailed attention: (1) that the affidavits fail to meet the requirement of § 2518(1)(c) by showing that normal investigative techniques have failed or appear to be unlikely to succeed, and (2) that the intercepts were not "conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter." 18 U.S.C. § 2518(5).

█ On the first theory, defendants contend that wiretap surveillance is permissible only as a "last resort" where more traditional and less intrusive techniques have been tried unsuccessfully. The law of the First Circuit, as set forth in the seminal case of *United States v. Scibelli,* 549 F.2d 222 (1st Cir.), *cert. denied,* 431 U.S. 890, 97 S.Ct. 2687, 53 L.Ed.2d 278 (1977) does not support this interpretation of § 2518(1)(c). Quite to the contrary, it is clear that the statute does not require that the Government exhaust all other means before a wiretap order may issue. *Id.* at 226. Rather, the statute is designed to safeguard against wiretaps being "routinely employed as the initial step in a criminal investigation." *United States v. Giordano,* 416 U.S. 505, 515, 94 S.Ct. 1820, 1827, 40 L.Ed.2d 341 (1974).

Here, Agent Hampe's affidavit has painstakingly described law enforcement agent's unsuccessful efforts to penetrate the conspiracy by traditional means. He also gave reasons why further attempts were unlikely to succeed. By way of example, the affidavit recites that visual surveillance produced indicia of "suspicious activity" but not the competent evidence necessary for prosecution. Law enforcement agent's unsuccessful attempts at infiltration and their use of other undercover techniques and the obstacles encountered in those attempts are described by the affiant. Because of the high mobility and extreme wariness and caution of the participants in the conspiracy, traditional search warrants would be unlikely to discover the cache of cocaine or identify other persons involved. Informant testimony was not a realistic alternative, given the informant's unwillingness to expose themselves to retaliation. Similarly, Agent Hampe was of the opinion that key participants in the conspiracy would be unwilling to testify even if given immunity. Such opinions, based on lengthy investigative experience, may be properly considered here. *See Scibelli,* 549 F.2d at 227.

On a motion to suppress, the government's showing that traditional investigative techniques have been tried, or are unlikely to succeed is to be "tested in a practical and commonsense fashion." *Id.* at 226. By this standard, I rule that the Government's affidavits satisfy the requirements of § 2518(1)(c).

With regard to their minimization claims, the defendants complain that interceptions were made when named parties were not within the premises where the phone was located, that the interceptions were not otherwise properly minimized, that conversations between unnamed parties were intercepted, that calls not involving criminally culpable behavior were intercepted, and that defendants were not provided with an intercept inventory as required by § 2518(8)(d).

In response, the Government has submitted an additional affidavit by Agent Hampe which describes the minimization procedures followed. This affidavit recites that all persons assigned to the listening post were informed of the goals and nature of the investigation and the identities of the named interceptees. The intercepting officers were also required to read the wiretap affidavits and the orders issued by Judge Nelson. The court order limiting the hours of interception were strictly complied with, and an effort was made to minimize the interceptions on a call-by-call basis. Agent Hampe prepared the following statistics on the numbers of calls intercepted and minimized:

Number of Call[1] (Incoming and Outgoing)

4.985 or 100%

Number of Incriminating Calls

306 or 6%

Conversations Minimized

700 or 15%

Number of Calls That Were Too Short to Minimize[2]

3,017 or 60%

Number of Unanswered or Attempted Calls

900 or 18%

Additionally, I note that the October 2 order required progress reports every five days; that the October 31 order required progress reports every ten days; and that the Government complied with these requirements.

Section 2518(5) requires that listening agents minimize the interception of nonpertinent conversations. It does not however, require that no nonpertinent conversations be intercepted. The focus of the Court's inquiry is the "reasonableness of the agents attempts to minimize in light of the purpose of the wiretap and the information available to the agents at the time of interception." *Scott v. United States,* 436 U.S. 128, 133, 98 S.Ct. 1717, 1721, 56 L.Ed.2d 168 (1978). Several factors may be considered in this analysis, including the percentage of calls minimized, the duration of the calls, the use of ambiguous or coded language by conversants, and the breadth and nature of the conspiracy. *Id.*

■ With these factors in mind, I find and rule that the agents in this case made reasonable efforts to minimize interception of non-pertinent calls. I find that a very large number of the calls, i.e. 60.5% thereof, were too short to minimize, particularly considering the scope of the conspiracy. Of those calls which lasted more than one minute, almost all of the non-minimized conversations were pertinent to the investigation.

■ The interception of calls between non-named parties is also subject to a "reasonableness" test. Where the subject telephone is located in the home of a person believed to be a principal in a major drug ring, agents may reasonably suspect that calls are drug-related. *See, Scott,* 436 U.S. at 140, 98 S.Ct. at 1724. In other words, the mere fact that named parties are not present does not require the agents to immediately terminate surveillance-normal minimization procedures still apply. In ruling that these interceptions do not violate minimization requirements, I am cognizant that this conspiracy involved a large number of participants in at least two states. Therefore, the expectation that new partici-

---

**1.** A "call" is any action involving the lifting of a telephone headset and incoming calls, whether *answered or not.*

**2.** These calls were usually 30 to 60 seconds or less in duration.

pants in the conspiracy might be identified at any time is not unreasonable, particularly when the subject telephone is thought to be a primary means of facilitating the distribution of cocaine. I further note that the Court maintained close supervision of this surveillance through frequent progress reports, a factor which weighs against suppression of this evidence for failure to minimize.

For these reasons, I rule that these motions to suppress wiretap evidence obtained through interception of telephone number (617) 277–8290 should be denied.

### Defendant Felix Rengifo

Defendant Felix Rengifo moves to suppress evidence obtained through court-authorized interception of communications on the following two telephones: (617) 277–8290, subscribed to be Elmer Rodriguez; and (516) 348–6970, subscribed to be Felix Rengifo in Hauppauge, New York. Both the government and defendant Rengifo have agreed that probable cause for the wiretap on Rengifo's telephone may be established only by using information obtained by means of the wiretap on the Rodriguez telephone. Consequently, Rengifo argues that the evidence obtained through surveillance of the Rodriguez telephone is inadmissible, and therefore cannot provide probable cause for interception of communications on the Rengifo telephone.

I have ruled above that the affidavit on its face provides probable cause for a wiretap order to issue for telephone number (617) 277–8290. Without challenging the validity of the wiretap order itself, defendant Rengifo takes the position that the affidavit was insufficient to show probable cause *as to him.* According to this theory, conversations in which Rengifo was a participant would not be admissible, even though the application and order name him as a probable interceptee.

Section 2518(4)(a) requires that an order authorizing interception of wire communications specify "the identity of the person, if known, whose communications are to be intercepted." This provision has been construed to mean that the application must name each person likely to be intercepted when probable cause exists to believe that the person is committing the offense for which the wiretap is sought. *United States v. Donovan,* 429 U.S. 413, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977). Here, the defendant seems to argue the reverse—that where an interceptee is named and no probable cause exists any evidence obtained should be suppressed. This argument runs afoul of the teaching on *United States v. Kahn,* 415 U.S. 143, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974), which held that even the communications of unnamed persons need not be suppressed where the statements are within the scope of the criminal activity described in an order which specifies that the communications of "unknown persons" may be intercepted. *Id.* at 156–7, 94 S.Ct. at 984–5. It follows, therefore, that if Rengifo had not been named as a probable interceptee, he would be unable to challenge on these grounds. To require identification of persons for whom probable cause exists, yet punish for naming a person for whom it does not exist would be to force passage between Scylla and Charybdis.

The United States Supreme Court has identified the two policy objectives of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S. §§ 2510–2520 to be: (1) the authorization of electronic surveillance as a weapon against organized crime; and, (2) the protection of individual privacy. *Kahn,* 451 U.S. at 151, 94 S.Ct. at 982. Neither objective would be served by the statutory construction which the defendant propounds. *United States v. Martin,* 599 F.2d 880 (9th Cir.), *cert. denied,* 441 U.S. 962, 99 S.Ct. 2407, 60 L.Ed.2d 1067 (1979). Probable cause need not be shown for each person named in an application so long as it is shown with respect to at least one individual. *Id.* at 885.

 Therefore, without reaching the issue of whether probable cause existed as to defendant Rengifo, I rule that evidence obtained during intercepts on the Rodriguez telephone is admissible against defendant Rengifo. I further rule that the

affidavit in support of the application for interception of communications on Felix Rengifo's own telephone shows, on its face, that probable cause existed for the order, that the affidavit made the requisite showing regarding the practicability of other investigative techniques, and that the interception was conducted in accordance with the order. I rule that defendant Rengifo's motion to suppress this wiretap evidence should be denied.

## SEARCH WARRANT EVIDENCE

The defendants have made motions to suppress evidence seized in nine separate searches. Law enforcement officers obtained warrants authorizing each of these searches. Due to the large number of motions filed by defense counsel on this subject, it is preferable to organize the Court's analysis in terms of the locations searched, whereby overlapping motions may be addressed simultaneously.

### Various Locations

■ The first group of motions, filed by defendants N. Rodriguez, E. Rodriguez, Calderon, Malacaria, P. Scala, J. Brand, Mosquera, and H. Brand, challenges the validity of search warrants authorizing the search of "various premises of persons allegedly connected with this case." Facially, these motions fail to state grounds for suppression. The defendants fail to specify which of the nine warrants they challenge, and, more importantly, fail to claim any basis for their standing to challenge such searches. *See United States v. Salvucci,* 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980); *Rawlings v. Kentucky,* 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980). Consequently, I rule that these motions to suppress should be denied.

### 77 Walnut Street, Brookline

■ Two distinct searches were conducted at 77 Walnut Street in Brookline, Massachusetts. The two apartments searched were the first floor residence of Elmer Rodriguez and the third floor residence of Nelson Rodriguez. Quantities of drugs, paraphernalia, cash and other evidence were found in each of the two apartments. Both Nelson and Elmer Rodriguez move, without supporting memoranda to suppress such evidence.

A single seventy-five page affidavit was filed by DEA Agent Hampe in support of applications for warrants for all eight Massachusetts locations to be searched. With respect to this location, the affidavit recites evidence obtained through electronic surveillance and conventional investigative techniques which show that both Nelson and Elmer Rodriguez were engaged in an ongoing cocaine distribution enterprise through the end of November, 1984. Several intercepted conversations, reproduced in the affidavit, indicate cocaine was frequently stored in Nelson's apartment and brought down to Elmer's apartment as needed for a sale.

Upon consideration of the nature of the criminal activity engaged in at the premises, and the voluminous evidence marshalled in Agent Hampe's affidavit taken as a whole, I find and rule that the search warrants were properly issued upon the basis of probable cause. I therefore rule that the motions to suppress evidence found at 77 Walnut Street, Brookline, should be denied.

### 22 High Street, Brookline

■ Defendant Helmer Mosquera moves to suppress evidence seized during a search of his residence at 22 High Street, Brookline. From Agent Hampe's affidavit it is apparent that defendant Mosquera was heavily involved in the cocaine distribution ring, and that he conducted this business, in large part, from his home. Moreover, an intercepted conversation with defendant Brand Elmer Rodriguez indicated that Mosquera was holding a quantity of cocaine "there"—probably meaning Mosquera's home. Although this intercept was made on October 26, 1984, the incident is part of a continuous chain of criminal conduct, and this information was not stale at the time the warrant was obtained. *See United States v. Hershenow,* 680 F.2d 847, 853 (1st Cir.1976).

Accordingly, I rule that the search warrant for these premises was properly sisued upon the basis of probable cause and that the motion to suppress should be denied.

### 5 Bickford Road, Malden

■ Defendant Milton Calderon moves to suppress evidence obtained during the search of his residence at 5 Bickford Road, Malden, Massachusetts. Again, the affidavit indicates a pervasive involvement with the cocaine distribution ring. A conversation intercepted October 19, 1984 indicates that Calderon possessed a quantity of cocaine at his residence at that time. A later intercept indicates that Calderon was also in possession of cocaine on November 16. As late as November 21 Calderon was holding cash proceeds from cocaine sales.

Based upon the evidence described in the affidavit as a whole and the particular assertions recited above, I rule that the search warrant for 5 Bickford Street, Malden, was issued on probable cause, and that the motion to suppress should be denied.

### 250 Hammond Pond Parkway

### Apartment 809–South, Newton

■ Defendants Patrick Scala and Leslie Grover move for suppression of evidence seized at 250 Hammond Pond Parkway, Apartment 809-South, Newton, Massachusetts. At the outset, I note that there is a question as to Patrick Scala's standing to contest the validity of the search. The government asserts that Leslie Grover was the sole occupant of the premises. Defendant Scala has failed to present any evidence, either by affidavit or testimony, which would indicate a legitimate expectation of privacy in the premises. Therefore, I find and rule that defendant Patrick Scala lacks standing to challenge this search.

■ With respect to defendant Leslie Grover, the evidence marshalled in Agent Hampe's affidavit is consistent with an ongoing involvement in the criminal enterprise. More specifically, the affidavit indicates that Grover made arrangements to purchase cocaine on October 3, that she was in possession of cocaine on October 5,

and that she, together with Patrick Scala, purchased a substantial amount of cocaine on October 10. Keeping in mind the "staleness" concerns discussed above, I find and rule that there was probable cause for a warrant to issue authorizing the search of 250 Hammond Pond Parkway, Apartment 809-South, Newton, Massachusetts.

### Delaware Place, Apartment 1

### Brighton

■ Six Delaware Place is the residence of Harvey and Javier Brand, who move for suppression of the evidence seized there. A perusal of Agent Hampe's affidavit makes it readily apparent that this location was continuously used to store and distribute cocaine. Accordingly, I find that probable cause existed to issue a warrant authorizing a search of the premises, and rule that the motion to suppress should be denied.

### 1159 Washington Street

### Norwood "The Gold Merchant"

■ James Malacaria, proprietor of "The Gold Merchant" moves for suppression of evidence found on the premises during the execution of a search warrant. On its face, the affidavit shows that Malacaria was also heavily involved in cocaine trafficking. One intercepted conversation indicates that as late as November 18 he was in possession of a very substantial amount of cocaine. The affidavit also indicates that cocaine was delivered to Malacaria's store on October 26 and November 15.

Accordingly, I rule that probable cause existed to issue a warrant authorizing a search of "The Gold Merchant" on Washington Street in Norwood and that the motion to suppress should be denied.

### 255 Lincoln Boulevard

### Hauppauge, Long Island

### New York

■ Defendant Felix Rengifo has moved to suppress evidence seized at his residence, 255 Lincoln Boulevard, Haup-

page, Long Island pursuant to a search warrant. The affidavit for this search warrant was executed by DEA Agent Thomas Cregan. The affidavit relies heavily upon court authorized wiretap intercepts of conversations on telephones subscribed to by Elmer Rodriguez and Gladys Rengifo. Visual surveillance in both the Boston area and in New York supplements these intercepts.

The affidavit contains numerous excerpts of intercepted conversations between Felix Rengifo in New York and confederates in New England, including Donald Rengifo, Elmer Rodriguez and Liz Maria Rengifo. Other relevant conversations took place among the New England members of the group. These intercepts, which took place between October 2, 1984 and November 17, 1984, show an extensive pattern of drug trafficking in which Felix Rengifo was a supplier of cocaine. Many conversations concern the financial aspects of the operation, with frequent reference to debts and disposition of proceeds of sales. There is also a reference to a "beeper," owned by Felix Rengifo and used to facilitate drug transactions.

While these facts alone do not indicate the presence of cocaine in Rengifo's home, visual surveillance of the location supplies the missing link. On at least three occasions persons belonging to the New England end of the operation visited Felix Rengifo's home. These visits were contemporaneous with intercepted telephone conversations which discussed the delivery of money or pick-up of cocaine from Rengifo. These conversations sometimes specified the couriers, and times of arrival and departure. The pattern is the same in all three trips: the couriers were observed leaving the Boston area, followed surreptitiously to the Massachusetts Turnpike, then observed by DEA Agents in New York upon their arrival. The logged times indicate that the couriers traveled directly to the Rengifo House on Long Island, then returned immediately to the Boston area.

Although the last of these trips took place on November 16, Felix Rengifo's involvement in the conspiracy as a cocaine supplier was continuous. Consequently, I find and rule that the search warrant was properly issued upon probable cause to believe that cocaine, proceeds of illicit sales, instrumentalities and paraphernalia were present at 255 Lincoln Boulevard, Hauppauge, Long Island.

## POST–ARREST STATEMENTS

### Rodney King

Defendant Rodney King was arrested after law enforcement officers, armed with a search warrant, entered and searched his residence at 2 Crawford Street, Cambridge. The substance of King's motion is that post-arrest statements and other evidence was obtained in contravention of his Fourth, Fifth and Sixth Amendment Rights.

By affidavit accompanying his motion to suppress, defendant King relates the following version of the events surrounding his arrest. At 7:00 a.m. on December 19, 1984 six law enforcement officers broke down the door to King's apartment without warning and entered. King was ordered to the floor, told to put his hands behind his back, kicked in the head just hard enough to indicate "the price of resistance," then told that he was under arrest, handcuffed, and lifted to his feet. At this time he spoke to Agent Murphy, saying that he "would cooperate fully with her" and there was no need for the male agents to "bust up the place." She then advised him of his rights, including his right to have an attorney present. Upon hearing this, King asked "may I call my attorney right now?" Agent Murphy did not respond, but asked "where's the stuff?" King said he would tell her where it was if she would give it to him in writing that the men would not tear up the place. There followed some discussion about whether Murphy would put this in writing, during which King again asked for his attorney. Murphy continued to ask questions about where "it" was. Subsequently she executed a document making the requested promise and he directed her to his cache of cocaine.

In opposition to defendant King's motion, the government has submitted the affidavit of DEA Agent Normandene Murphy, which differs from King's version in several respects. Murphy asserts that the raiding party knocked on the glass outer door of the apartment, causing King to open the inner door. They identified themselves by yelling "police" and displaying badges. King then slammed the inner door shut. Only then did the agents forcibly enter the premises. When Murphy entered the apartment, King was already prone on the floor with his hands handcuffed behind his back. King said he wanted to cooperate, but Murphy told him to wait and proceeded to read him his "Miranda" rights. After the rights were read to him, King asked to call his attorney. Although Murphy made a telephone directory available to King, he was unable to make a call because he could not remember the attorney's name. According to Murphy, no questions were asked of King after he made his request to call an attorney. Some time later, King made an unsolicited offer to cooperate if the agents agreed not to tear up the house. Murphy responded by saying "nothing would be torn up or destroyed" if King cooperated. She subsequently put this promise in writing and obtained King's cooperation in locating and seizing contraband.

Regardless of which version of the facts one accepts, it is clear that defendant King made a request for counsel. Once an accused requests counsel "the interrogation must cease until an attorney is present." *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Having invoked his Fifth and Fourteenth Amendment right against self incrimination, a defendant may not be subjected to further questioning unless he initiates the dialogue making a "knowing and intelligent" waiver. *Edwards v. Arizona*, 451 U.S. 477, 486 at n. 9, 101 S.Ct. 1880, 1885 at n. 9, 68 L.Ed.2d 378 (1981). A court should determine whether such waiver has occurred by considering the "totality of the circumstances" surrounding the statement.

As to the material facts, there is little discrepancy between the two affidavits. Both agree that defendant King, under arrest and handcuffed, offered to cooperate in return for a promise that the agents not damage or disrupt his apartment. After the promise was given, he told Agent Murphy where the cocaine was hidden. Certainly, the defendant's version of the arrest describes a more violent, coercive atmosphere, and asserts that he asked for his lawyer twice. However, even if one accepts the government version of the facts, there was a highly coercive atmosphere in the apartment. It is just this coercion, inherent in a custodial situation, which the *Miranda* warnings were intended to dispell. *Miranda*, 384 U.S. at 467, 86 S.Ct. at 1624.

There was, however, an additional element of coercion which influenced King's decision to cooperate—the fear that the agents would "bust up the place." If this fear had caused King to blurt out the location of the evidence without prodding from the agents, quite a different issue would be before the Court. The fact is that Agent Murphy encouraged this fear and used it as a basis for negotiation. I find that during this process, she resumed questioning on the basis of King's inquiry. Although he initiated the conversation, King's admission was the product of an implied threat of unnecessary and possibly unlawful destruction. It can hardly be said that statements obtained through such machinations are the result of voluntary, knowing, and intelligent waiver of the previously invoked right to counsel within the contemplation of *Edwards*. Accordingly, I find that King did not effectively waive his right to the Fifth and Fourteenth Amendment Rights, and rule that all statements by King should be suppressed.

Having suppressed defendant King's statements there remains the question whether certain physical evidence should also be suppressed. The defendant argues that this evidence was discovered as a result of these tainted statements and is therefore inadmissible. In support of ad-

missibility the government argues that even without King's assistance the agents would have discovered this evidence, thereby coming within the "inevitable discovery" exception to the exclusionary rule. *Nix v. Williams*, —— U.S. ——, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). Upon consideration of all the circumstances surrounding this search, I conclude that a team of well trained and experienced law enforcement officers would have discovered the cocaine and other evidence without King's assistance. I rule, therefore, that defendant King's motion to suppress this physical evidence should be denied.

### Felix Rengifo

Defendant Felix Rengifo moves to suppress incriminating post-arrest statements which DEA agents allegedly obtained from him in violation of his Fifth Amendment rights against self-incrimination. The Court held an evidentiary hearing on this matter on March 11–13, 1985, and received testimony from four DEA agents as well as defendant Rengifo and his wife, Patricia Rengifo. The testimony given by the Rengifos and that presented by the four agents reveals two dramatically different versions of the circumstances under which defendant Rengifo made the incriminating remarks which he now seeks to suppress. Having observed the demeanor of Mr. and Mrs. Rengifo on the witness stand, and having carefully examined the substance of their testimony, I find that none of the testimony given by either defendant Rengifo or his wife is worthy of credence. I therefore rely solely on those portions of the four agents' testimony which I find credible. Pieced together, the credible evidence reveals the following picture of the events surrounding defendant Rengifo's arrest and interrogation.

At approximately 6:00 a.m. on December 19, 1984, nine DEA agents, armed with a search warrant and a warrant for the arrest of Felix Rengifo, went to Rengifo's home at 255 Lincoln Boulevard in Hauppauge, New York. The agents knocked at the front door and were admitted by defendant's wife, Patricia Rengifo. The agents identified themselves and explained that they had come to execute the two warrants. After a brief search of the dwelling, the agents determined that Mrs. Rengifo and her infant were alone in the house.

While the other agents began to perform a thorough search of the residence, Agents Yaniello and Cregan talked to Mrs. Rengifo and asked her to contact her husband by means of his beeper, which she did. Shortly thereafter, Rengifo called the house by telephone in response to his wife's message. Agent Yaniello spoke to Rengifo and told him that DEA agents were presently at his home and that they possessed a warrant for his arrest. Yaniello asked Rengifo to return home immediately, and informed him that he would be a fugitive if he did not do so. Rengifo replied that he would be there in about thirty minutes.

Defendant Rengifo arrived at about 7:30 a.m. He was met in the driveway by several agents who frisked him, informed him that he was under arrest, and led him into the house. Defendant was then met in the living room by Agents Scalzo and Yaniello. Yaniello described to defendant Rengifo the strength of the case against him. The agent informed him that he had been identified as a cocaine supplier to New England. Furthermore, Yaniello explained the government had placed a tracer on his car and had wiretapped not only his own phone but also the phones of some of his friends and relatives. Yaniello then gave Rengifo his *Miranda* warnings. Rengifo asked the agent to repeat one of the warnings, and then stated that he understood all of his rights. He further stated that he wished to cooperate and that he was willing to talk to the agents. Defendant Rengifo then suggested that he, Scalzo and Yaniello go down to the basement to talk. He said that he did not want his wife to overhear their conversation, and that the bustle of the search and the presence of so many agents made him nervous.

Defendant Rengifo and the two agents held their conversation in a corner of the

basement where there were two desks and a chair. The interrogation lasted approximately one hour. The door at the top of the basement stairs was left open for most, if not all of this time. Scalzo and Yaniello both testified that Rengifo appeared calm and rational throughout the interrogation, and they characterized the tenor of the conversation as "relaxed" and "friendly." Agents Cregan and Friel, who remained upstairs during the interrogation, testified that they never heard the sound of raised voices coming from the basement. At one point, Mrs. Rengifo went into the basement to see how her husband was doing.

During the interrogation, defendant Rengifo gave incriminating responses to many of the agents' questions, although he refused to answer some questions, such as the name of the individual from whom he obtained cocaine. Rengifo stated that he wanted to cooperate because he knew he was in trouble and had expected to be arrested for some time. He also expressed concern about his own safety and that of his wife and child, and his mother in Columbia, because he feared his confederates in the drug trade would seek retaliation if they learned of his cooperation. In exchange for cooperating, Rengifo apparently sought absolute immunity, physical protection, and a promise that he would not be required to testify on behalf of the government. Although the agents replied that they lacked the authority to promise anything more than protection, they also stated that any helpful information which he provided would be reported to the Court. They also told Rengifo that he would probably spend a long time in jail if he were convicted. From the time of his arrest to the end of the interrogation, Rengifo never expressed a desire to call a lawyer, and none of the agents offered to allow him to use the telephone for that purpose.

At about 8:30 a.m., Agents Yaniello and Scalzo took Rengifo upstairs to the kitchen where Agent Friel explained to Rengifo and his wife that he would be taken first to the DEA office and then to the federal courthouse for the Eastern District of New York for arraignment.[3] Agent Friel asked Rengifo if he had an attorney whom he would like to have meet them at the federal courthouse. Rengifo apparently questioned Agent Friel about the role of an attorney in the impending court proceedings, and then stated that he would like to have a lawyer present at the arraignment. Agent Cregan wrote down the name of an attorney whom Mrs. Rengifo could contact. Agent Friel also told Rengifo that a lawyer would be provided for him at the courthouse if he were unable to obtain a lawyer of his own to represent him at the arraignment.

Agents Friel and Cregan then transported defendant Rengifo to the DEA office for processing. There was no conversation between defendant and the agents during this brief trip. At about 9:30 a.m., the three left the DEA office en route to the federal courthouse. While they were in the car, Agent Friel read defendant his *Miranda* rights from a standard DEA card and asked defendant whether he understood each of his rights. During the trip, defendant apparently initiated a conversation with the agents and began to volunteer incriminating information. Agent Friel therefore repeated the *Miranda* warnings. Rengifo nevertheless continued to talk to the agents. Both agents testified that the conversation was friendly, and that it focused on Rengifo's fear for his life and the lives of his family members and his desire to cooperate with the government. Rengifo also gave the agents directions for the fastest route to the federal courthouse. At about 11:00 a.m., the three arrived at the courthouse where they waited more than six hours before a magistrate became available to perform the arraignment.

Defendant Rengifo apparently spent part of this waiting period in a holding cell and part of it in the company of Agents Friel

---

**3.** Counsel for the government has informed the Court that the judicial proceeding which all the witnesses referred to as "arraignment" was actually an initial appearance during which bail was set.

and Cregan. At some point, Rengifo telephoned his wife from the courthouse and learned that an attorney was coming to meet him. He nevertheless continued to make admissions to the agents and stated, at one point, that he did not need a lawyer while talking to them. Rengifo's attorney arrived at about 4:30 p.m., and the defendant was arraigned shortly after 5:00 p.m.

None of the agents involved in the case ever obtained from defendant Rengifo a signed waiver of his *Miranda* rights or a signed statement setting forth the admissions which he had made throughout the day.

 In a situation such as this, where no express written or oral waiver of Fifth Amendment rights was obtained from defendant, a court must make two determinations. It must decide, first, whether defendant knowingly and intelligently waived his Fifth Amendment rights, *North Carolina v. Butler*, 441 U.S. 369, 373, 375, 99 S.Ct. 1755, 1757, 1758, 60 L.Ed.2d 286 (1979), and second, whether the incriminating statements which defendant allegedly made were "the product of a rational intellect and a free will." *Blackburn v. Alabama*, 361 U.S. 199, 208, 80 S.Ct. 274, 280, 4 L.Ed.2d 242 (1960). In making these assessments, a court should consider not only the circumstances under which the statements were given, but also relevant personal characteristics of the accused, such as his background, intelligence, and experience. *Fare v. Michael C.*, 442 U.S. 707, 725, 99 S.Ct. 2560, 2571, 61 L.Ed.2d 197 (1979); *North Carolina v. Butler*, 441 U.S. at 374–75, 99 S.Ct. at 1757–58.

 Applying these criteria to defendant Rengifo's case, I find that the defendant knowingly and intelligently waived his Fifth Amendment rights against self-incrimination. Rengifo, who has been a resident of the United States for 18 years, understands English well and speaks it competently. The testimony he gave concerning the corporate structure of his taxicab business indicates that he is an intelligent businessman.

At the time of his arrest, Rengifo appeared calm and rational. The arrest did not take him by surprise. He was informed by Agent Yaniello on the telephone that he was going to be apprehended half an hour before the arrest occurred. As he drove home, he presumably had time to contemplate the impending arrest and to assess his situation. Furthermore, he told Agents Scalzo and Yaniello that he had expected to be arrested for some time.

The evidence also reveals that Rengifo was given his *Miranda* rights three separate times. On each occasion, he indicated by his words and actions that he understood his rights and wished to cooperate. He then proceeded either to answer questions posed by the agents or to volunteer incriminating information. Although Rengifo asked for an attorney before he was transported from his home to the DEA office, it is evident from the nature of his request that he wished to have counsel only in the Sixth Amendment sense, to represent him at the impending judicial proceedings, and not to assist or advise him in communicating with the DEA agents. *See Collins v. Francis*, 728 F.2d 1322, 1332, 1333 (11th Cir.1984). Thus, I find that the circumstances, taken as a whole, demonstrate that defendant made an informed and rational decision to waive his right to remain silent and his right to counsel.

I further find that defendant Rengifo's admissions were made voluntarily and were not coerced in any way. From the outset, Rengifo demonstrated a willingness to cooperate with law enforcement officers. The interrogation of defendant Rengifo which Agents Scalzo and Yaniello conducted in the basement of Rengifo's home was neither hostile nor lengthy. *See Frazier v. Cupp*, 394 U.S. 731, 737, 739, 89 S.Ct. 1420, 1423, 1424, 22 L.Ed.2d 684 (1969) (one hour of questioning considered an interrogation of "short duration."). Although a basement may not be an ideal place in which to question a suspect, the basement almost certainly provided an atmosphere which was more reassuring to defendant Rengifo than that offered by alternative locations, such as an interrogation room at DEA

headquarters. The basement, though austere, was familiar to defendant, and it was in close proximity to the kitchen, where Mrs. Rengifo remained with their baby. During the interrogation, the door at the top of the stairs leading to the kitchen was left open. Mrs. Rengifo went down to the basement once to check on her husband's condition and once to serve coffee to those in the basement.

Although agents Yaniello and Scalzo gave defendant Rengifo a detailed description of the case against him, informed him that he would probably serve a lengthy prison sentence if he were convicted, and promised to bring his cooperation to the attention of the Court, these statements alone do not constitute coercion. Providing such information to a suspect is "normally attendant to arrest and custody." *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1979). Furthermore, such information helps a suspect make a judicious decision about whether to waive his *Miranda* rights. *Cf. United States v. Guido*, 704 F.2d 675, 677 (2d Cir.1983); *United States v. Thierman*, 678 F.2d 1331, 1334 n. 3 (9th Cir.1982); *United States ex rel. Gorham v. Franzen*, 675 F.2d 932, 938 (7th Cir.1982).

The evidence produced at the suppression hearing also demonstrates that Rengifo did, in fact, use his right to remain silent to control the scope of the agents' interrogation. Agents Scalzo and Yaniello testified that Rengifo refused to answer several of their questions. "Through the exercise of his option to terminate questioning ... [a suspect] can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation." *Michigan v. Mosley*, 423 U.S. 96, 103–4, 96 S.Ct. 321, 326, 46 L.Ed.2d 313 (1975). The selectivity with which defendant Rengifo revealed information to the agents contributes to the Court's conclusion that Rengifo's incriminating statements were made of his own free will. *See United States v. Thierman*, 678 F.2d at 1335.

Because I find that defendant Rengifo knowingly waived his *Miranda* rights and

that he thereafter voluntarily provided incriminating information, I rule that defendant Rengifo's motion to suppress post-arrest statements should be denied.

Order accordingly.