UNITED STATES of America, Appellee,

v.

Francesco SCIBELLI, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Andrew TORINO, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Daniel SACCO, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Adolfo BRUNO, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Lawrence STONE, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Joseph ALBANO, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Anthony MALONI, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Rocco ALBANO, Defendant, Appellant.

Nos. 76–1214 to 76–1221.

United States Court of Appeals,
First Circuit.

Heard Oct. 6, 1976.

Decided Jan. 31, 1977.

Joseph J. Balliro, Boston, Mass., for Francesco Scibelli, appellant.

Jay M. Forgotson, Springfield, Mass., for Andrew Torino, appellant.

James M. Pool, Boston, Mass., by appointment of the Court, for Daniel Sacco, appellant.

John E. Barrett, West Springfield, Mass., with whom Jerry E. Benezra, Boston, Mass., was on brief, for Adolfo Bruno, appellant.

Edward L. Donnellan, Springfield, Mass., with whom Keyes, Donnellan & Danaher, Springfield, Mass., was on brief, for Lawrence Stone, appellant.

Robert H. Abrams, Springfield, Mass., by appointment of the Court, for Joseph Albano, appellant.

Michael O. Jennings, Springfield, Mass., by appointment of the Court, for Rocco Albano, appellant in case no. 76–1221, and for Anthony Maloni, appellant in case no. 76–1220.

George F. Kelly, Atty., U.S. Dept. of Justice, Washington, D.C., with whom James N. Gabriel, U.S. Atty., and Gerald E. McDowell, Atty., U.S. Dept. of Justice, Washington, D.C., were on brief, for appellee.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

The two-count indictment in this case charged appellants, eight in number, and two others, with operating an illegal gambling business and with conspiracy to commit the substantive offense in violation of 18 U.S.C. §§ 1955[1] and 2.[2] The indictment arose out of a six-month investigation by the FBI and the Massachusetts State Police in 1974 into gambling operations in western Massachusetts. After denial of pre-trial defense motions to suppress evidence derived from three periods of electronic surveillance, defendants waived a jury trial, and the Government, counsel for the defendants and the defendants themselves agreed to a "Stipulation" of "facts and opinions" which "together with such physical and testimonial evidence as may be offered and admitted into evidence shall constitute the evidence upon which the issues of fact and law in this case are to be determined, subject, however, to those objections as are enumerated herein." Defendants specifically reserved "their challenge to the validity of the court orders herein discussed, their challenge to the manner in which the said court orders were implemented, or any other matter heretofore raised on motion." Based on the Stipulation, the district court found all appellants guilty as charged on both counts. Apart from the Stipulation, the record in this case contains the Government's three applications for wiretap orders, the defense motions to suppress, and the transcript of the pre-trial hearing on those motions.

The arguments upon appeal may be conveniently divided into two groups. Six[3] of the eight appellants argue that the district court erred in denying defense motions to suppress the evidence derived from the Government's electronic surveillance. This argument is based on the contention that the Government failed to comply with 18 U.S.C. § 2518(1)(c), which requires the Government in making application for a wiretap order to include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." The remaining two appellants[4] argue solely that the evidence in the Stipulation implicating them was insufficient to convict.

I

A brief review of the facts surrounding the three orders of the district court ap-

---

1. Section 1955 provides in pertinent part:
   "Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined not more than $20,000 or imprisoned not more than five years, or both."

2. Section 2, entitled "Principals", provides:
   "(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

   "(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."

3. Francesco Scibelli, Andrew Torino, Daniel Sacco, Joseph Albano, Anthony Maloni, and Rocco Albano.

4. Adolfo Bruno and Lawrence Stone.

proving electronic surveillance will help to clarify our discussion of appellants' argument that the Government did not comply with 18 U.S.C. § 2518(1)(c). FBI Special Agent Ringgold testified at the hearing on the motions to suppress that he began investigating gambling operations in western Massachusetts in June, 1974. He said that he first suggested to his supervisors the need for electronic surveillance four to six weeks later. On October 15, 1974, the district court issued an order, E.B.D. 74–224, on application from the Government, directing interception of wire communications on two telephone numbers in western Massachusetts for a period of twenty-one days. The Government's application was supported by a 78-page affidavit of Agent Ringgold. In pertinent part, the affidavit stated in conclusory terms that "Normal investigative procedures have failed to gather evidence necessary to sustain prosecution for violations of these offenses and appear unlikely to succeed if tried further." Agent Ringgold stated later in the affidavit more specifically why normal investigative procedures appeared unlikely to succeed.

"While execution of search warrants involving individuals and locations relevant to this investigation may well produce gambling related paraphernalia, it is my experience that gambling records are often sketchy in nature, often contain code names, and rarely establish a provable connection between all the participants in the illegal gambling business. None of the informants cited above is willing to testify as to information they have imparted for fear of their personal safety. . . . [W]ith respect to [A], immunity has been tried before the Grand Jury currently investigating organized gambling in the Western Massachusetts area[,] . . . [and his] testimony is not likely to result in the indictment of any other gamblers. . . . [I]t is apparent from the conduct of the subjects that meaningful admissions or evidence of criminal associations and the roles played by the various members of this organized gambling business are not likely to be secured by a continuation of this

form of investigation. In addition, the repeated presence of . . . undercover individuals may well reveal the fact that the subjects are under law enforcement scrutiny. For example, it is apparent that the subjects continually utilize the table in the right rear area of the lounge on a consistent basis in order to hold subdued conversation. . . . [T]oll record information, while valuable in providing circumstantial proof that certain known bookmakers and bettors are in regular telephone contact, they do [sic] not establish the actual identity of the participants[,] . . . provide any evidence whatsoever as to the contents of the conversation[,] . . . [or] reveal contact . . . among bookmakers and bettors residing within the same dialing area."

The district court issued a second wiretap order, E.B.D. 74–275, on November 14, 1974, directing interception of wiretap communications on four new numbers in western Massachusetts for a twenty-one day period. The supporting affidavit, which incorporated by reference the first affidavit, again represented that "Normal investigative procedures have failed to gather evidence sufficient to sustain prosecution against all of the individuals believed to be committing these offenses", and went on to detail the need for electronic surveillance. Agent Ringgold explained that surveillance by means of a listening device planted in one location was "complicated by extraneous noise[,] . . . caused by a rather loud band . . . ."; he alleged facts tending to show "that the subjects of this investigation are extremely sensitive to what they consider to be law enforcement scrutiny"; and he stated that "[t]he informants cited in connection with this investigation continue to be unwilling to testify."

The third order for electronic surveillance, E.B.D. 74–295, directed interception of wire communications on two new numbers and was issued by the district court on December 10, 1974, for a period of twenty days. The supporting affidavit repeated that "Normal investigatory procedures have

failed to gather evidence sufficient to sustain prosecution against all of the individuals believed to be committing these offenses." Agent Ringgold came to this conclusion though he was "familiar with all the contents of all the tape recordings and contemporaneous log entries resulting from [the prior] interceptions . . ." and had been informed by the other state and federal investigators "as to any record checks, physical surveillances or other information which they have acquired from their direct participation in this investigation." The affidavit also stated again that "[i]nformants knowledgeable of this operation continue to be unwilling to testify for fear of their personal safety."

▇▇▇ Appellants claim that each of the Government's applications failed to satisfy the requirement of 18 U.S.C. § 2518(1)(c). That section requires that all applications include

> "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."

Section 2518(3)(c) of Title 18 attempts to assure that this requirement will be satisfied by imposing upon the district judge reviewing the application an independent obligation to

> "determin[e] on the basis of the facts submitted by the applicant that . . . normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous."

The judge's determination is, of course, reviewable on appeal, by which time the wiretap will normally have been authorized, the evidence gathered, and a conviction obtained. An appeals court's role is not to make a *de novo* determination of sufficiency as if it were a district judge, but to decide if the facts set forth in the application were minimally adequate to support the determination that was made. *United States v. DiMuro*, 540 F.2d 503, 510–11 (1st Cir. 1976), *cert. denied*, —— U.S. ——, 97 S.Ct. 733, 50 L.Ed.2d 749 (1977). *In re*

*Dunn*, 507 F.2d 195, 197 (1st Cir. 1974); *accord, United States v. Kalustian*, 529 F.2d 585, 589 (9th Cir. 1975); *United States v. Kahn*, 471 F.2d 191, 200–01 (7th Cir. 1972) (Stevens, J., concurring in part and dissenting in part), *rev'd on other grounds*, 415 U.S. 143, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974). As in reviewing the validity of a search warrant, the inquiry is whether the affidavit provided a sufficient basis for a finding of probable cause. *See United States v. Falcone*, 505 F.2d 478, 481 (3d Cir. 1974), *cert. denied*, 420 U.S. 955, 95 S.Ct. 1338, 43 L.Ed.2d 432 (1975).

▇▇▇ And in determining the sufficiency of the application a reviewing court must test it in a practical and commonsense manner. The legislative history makes clear that section 2518(1)(c) is not designed to force the Government to have exhausted all "other investigative procedures".

> "The judgment [of the district judge] would involve a consideration of all the facts and circumstances. Normal investigative procedure would include, for example, standard visual or aural surveillance techniques by law enforcement officers, general questioning or interrogation under an immunity grant, use of regular search warrants, and the infiltration of conspiratorial groups by undercover agents or informants. Merely because a normal investigative technique is theoretically possible, it does not follow that it is likely. What the provision envisions is that the showing be tested in a practical and commonsense fashion."

S.Rep.No.1097, 90th Cong., 2d Sess., 1968 U.S.Code Cong. & Admin.News, p. 2190 (citations omitted). The Supreme Court has observed that the purpose of the statutory language "is simply designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime," *United States v. Kahn*, 415 U.S. 143, 153 n. 12, 94 S.Ct. 977, 983, 39 L.Ed.2d 225 (1974), and that the section safeguards against wiretapping "procedures [being] routinely employed as the initial step in criminal investigation." *United States v. Giordano*, 416

U.S. 505, 515, 94 S.Ct. 1820, 1827, 40 L.Ed.2d 341 (1974). The fifth circuit has said,

> "[T]he purpose of the requirement in section 2518(1)(c) is not to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques."

*United States v. Pacheco*, 489 F.2d 554, 565 (5 Cir. 1974), *cert. denied*, 421 U.S. 909, 95 S.Ct. 1558, 43 L.Ed.2d 774 (1975). *Accord, United States v. Vento*, 533 F.2d 838, 849 (3d Cir. 1976); *United States v. Smith*, 519 F.2d 516, 518 (9th Cir. 1975); *United States v. Robertson*, 504 F.2d 289, 293 (5th Cir. 1974), *cert. denied*, 421 U.S. 913, 95 S.Ct. 1568, 43 L.Ed.2d 778 (1975).

■ Viewing the applications in light of these considerations, we find no error in the district court's refusal to suppress the wiretap evidence. Appellants contend that the affidavits of Agent Ringgold supporting the applications for the wiretap orders failed to give the necessary "full and complete statement" as they contain only bare, conclusory statements based on the affiant's experience. *See United States v. DiMuro, supra.* It is true that in his initial affidavit Agent Ringgold referred to his investigatory experience, stating that execution of a search warrant would likely be unavailing, that toll record information would not provide the hard information necessary to the Government's case, and that immunized gamblers "are extremely reluctant and unwilling to implicate other bookmaking associates . . . ." If this were all the affidavit had to offer in support of its conclusion that "normal investigative procedures . . . reasonably appear to be unlikely to succeed if tried . . . ", the question whether the affidavit met the statutory requirement would be closer; in *DiMuro* we expressed some uneasiness with such statements alone, fearing they might amount to little more than "mere conclusions based solely on past ex-

perience that gambling conspiracies are 'tough to crack' . . . ." *Id.* On the other hand, we earlier said, and we adhere to this view, that in deciding whether an application for a wiretap satisfied the statutory requirement, the court may "consider the nature of the alleged crimes." *In re Dunn, supra,* 507 F.2d at 197. A large-scale gambling conspiracy may by its structure and modus operandi give rise to a reasonable inference that "other investigative procedures . . . reasonably appear to be unlikely to succeed if tried."

■ But we need not decide whether Agent Ringgold's surmises based on investigatory experience would have been enough, since Agent Ringgold's affidavit in E.B.D. 74–224 did not stop there; the agent went on to specify the problems with using normal investigative procedures in that investigation. Ringgold stated that none of the several informants was willing to testify and observed that the one informant who had testified with immunity was unable or unwilling to give information to the grand jury that would lead to the indictment of other individuals. The affidavit also explained why continued physical surveillance would provide only cumulative evidence. The "conduct" of the subjects under investigation, according to Ringgold, led him to believe that normal surveillance techniques would not produce "meaningful admissions or evidence of criminal associations and the roles played by various members of this organized gambling business . . . ." This conclusion was tied specifically to the physical layout of the premises where most of the personal transactions between the subjects took place. Testing the affidavit "in a practical and commonsense fashion", we have no doubt that it was adequately specific in explaining why continued physical surveillance would not lead to substantial new evidence. Under the first application, therefore, the district court was fully justified in concluding that "normal investigative procedures . . . reasonably appeal to be unlikely to succeed . . . ." [5]

**5.** Appellant Scibelli argues that Agent Ringgold's testimony at the suppression hearing to the effect that he did not consider discussing with his informants the possibility of being

The two subsequent applications had also, of course, to meet the requirement of section 2518(1)(c), but incorporation of the affidavit in E.B.D. 74–224 in the latter two applications went a long way towards meeting the requirement; and each of the two subsequent applications alleges sufficient additional facts showing the continuing failure of normal investigative procedures to satisfy the standard of section 2518(1)(c). The affidavit in E.B.D. 74–275 revealed the unsuccessful attempt to gather evidence by means of a listening device, indicated that several targets of the investigation were becoming suspicious of law enforcement scrutiny, and reiterated that the informants remained unwilling to testify. In the affidavit supporting the third application, in addition to incorporating his previous two affidavits and repeating that the informants were unwilling to testify, Agent Ringgold stated that he was familiar with the results of the two periods of surveillance and that he had been informed of information acquired by other investigators,

and he still concluded that electronic surveillance was necessary. Considering together all factors mentioned in each affidavit, each was sufficient for the district court to find that it met the requirement of section 2518(1)(c).[6]

## II

Appellants Bruno and Stone attack their convictions solely on the ground that the evidence against them contained in the Stipulation was insufficient to convict.

The evidence against Bruno contained in the Stipulation included the following:

"Adolfo Bruno—Interceptions over [one of the numbers wiretapped] show defendant Adolfo Bruno discussing the sports line with defendant Daniel Sacco and indicated that he was formerly 'using' a particular game at '12½' but was now using it at '13'. Defendant Daniel Sacco also requested that defendant Bruno provide him with ten sports line sheets that had been filled in with line information."

given immunity, being placed in protective custody, or being relocated with a new identity in return for testifying because of his experience that all informants will resist testifying in gambling cases underscores the Government's failure to consider other investigative procedures prior to applying for the first wiretap order. We disagree. Agent Ringgold stated at the hearing, as he swore in the affidavit, that he had discussed with each informant the possibility of testifying, and each indicated an unwillingness to do so. From their responses, Agent Ringgold was entitled to conclude that it would be futile to pursue with them the possibility of immunity, protective custody and relocation. To limit the Government's investigation by requiring it to use every available incentive to induce informants to testify prior to seeking a wiretap order would "constitute unwarranted court interference with legitimate investigative discretion", *United States v. Robertson*, 504 F.2d 289, 293 (5th Cir. 1974), *cert. denied*, 421 U.S. 913, 95 S.Ct. 1568, 43 L.Ed.2d 778 (1975), and would effectively "foreclose electronic surveillance until every other imaginable method of investigation has been successfully attempted . . .", *United States v. Pacheco*, 489 F.2d 554, 565 (5th Cir. 1974), *cert. denied*, 421 U.S. 909, 95 S.Ct. 1558, 43 L.Ed.2d 774 (1975). The Government, moreover, would have been justified in concluding that the forced testimony of informants or individual bettors might not have been sufficient to reveal the scope of

this "large-scale" betting operation. *See United States v. Vento*, 533 F.2d 838, 849–50 (3d Cir. 1976). Agent Ringgold's statement in the first affidavit that according to the United States Attorney directing the grand jury's investigation into the gambling operation, the testimony of one informant before the grand jury was "not likely to result in the indictment of any other gamblers in the Western Massachusetts area" supports the Government's decision not to rely solely on such testimony to further its investigation.

6. Appellants Scibelli and Torino included in their statements of the issues two additional challenges to the sufficiency of the wiretap applications, but did not develop these issues in their briefs. Neither has merit. Their claim that by failing to disclose in his affidavit a payment of $50 to an informer, Agent Ringgold misrepresented an essential fact plainly falls short of affording a ground for overturning the wiretap order: the fact of the payment had little obvious bearing on the statutory requirements for obtaining a wiretap, and Agent Ringgold plausibly testified that he did not volunteer the information in his affidavit because he thought it to be irrelevant. *Compare United States v. Belculfine*, 508 F.2d 58 (1st Cir. 1974). Their second claim, that the application did not adequately state the particular offenses under investigation, is simply incorrect.

There was also evidence from phone toll records of 51 phone calls over a three-month period made from two phones to which Bruno had access, 29 of which calls were placed from his residence phone, to the J.K. Sports Journal, which "provided a recording of up-to-date sports results." The Stipulation included an "Expert Analysis" by FBI Agent Harker, who the parties agreed was "qualified to render an opinion concerning bookmaking based upon the physical evidence, tape recordings, and stipulations . . . ." He described the term "line" as a "figure which is picked [by a bookmaker] which, it is believed, will get people to bet on both sides of the game. . . . [A]s the betting starts out at the beginning of the week generally all bookmakers in all parts of the country start with the same line information. Then the bookmaker is free to alter that line as he sees fit." Agent Harker concluded that Bruno functioned as a "bookmake[r] who utilized the office as a source of line information and as an actual or potential outlet for lay-off wagers." He also gave his opinion that Bruno "provided a valuable service to the gambling business of Daniel Sacco by providing him with copies of line sheets which were apparently being used by him and other bookmakers."

■ Considered "in the light most favorable to the government, together with all legitimate inferences to be drawn therefrom", *United States v. Doran*, 483 F.2d 369, 372 (1st Cir. 1973), *cert. denied*, 416 U.S. 906, 94 S.Ct. 1612, 40 L.Ed.2d 111 (1974), the evidence against Bruno was sufficient to convict. Evidence of the discussion between Bruno and Sacco indicating that Bruno had decided to "use" a higher "line" on "a particular game" is convincing proof that Bruno was a bookmaker, and this sharing of "line" information suggests his connection with the larger gambling operation. The request from Sacco for sports line sheets is additional evidence of Bruno's participation in the overall operation. The evidence in the Stipulation, therefore, is adequate to prove the Government's case. "The exchange of line and other gambling information are necessary and useful functions in a gambling enterprise and persons who carry out such functions have been held to be engaged in 'an illegal gambling business.'" *United States v. DiMuro*, *supra*, 540 F.2d at 508, and cases cited.[7]

The evidence against appellant Stone is as follows:

"Lawrence Stone—On one interception dated October 22, 1974 . . . defendant Stone was revealed placing horse wagers with defendant Daniel Sacco.[8] On this one occasion, defendant Stone and defendant Sacco were discussing defendant Francesco Scibelli and the betting habits of an individual referred to as 'Carm Mazbo' (PH). On one interception . . . defendant Stone was revealed calling coconspirator Andrew Pradella and informing Pradella as to the betting preferences of someone referred to as 'that guy' on two particular professional football games on this one occasion. Interceptions . . . revealed a conversation between defendant Maloni and coconspirator Florian referring to defendant Stone as someone who had accepted horse wagers from a betting customer of Florian and Maloni."

7. Bruno argues that Agent Harker's opinion that Bruno "utilized the office as a source of line information and as an actual or potential outlet for lay-off wagers" and his conclusion that Bruno "provided a valuable service to the gambling business of Daniel Sacco by providing him with copies of line sheets which were apparently being used by him and other bookmakers" were unsupported by the evidence in the Stipulation and therefore inadmissible. *See Gray v. Shell Oil Co.*, 469 F.2d 742, 750 (9th Cir. 1972), *cert. denied*, 412 U.S. 943, 93 S.Ct. 2773, 37 L.Ed.2d 403 (1973). Bruno seems correct that the evidence does not afford a factual basis for the expert's opinion that he "utilized the office" in his bookmaking transactions. On the other hand, Agent Harker's conclusion that Bruno aided Sacco's gambling business by providing him with copies of line sheets is a fair inference from the stipulated evidence. The evidence would be adequate, in any event, without reference to Agent Harker's opinion on these matters.

8. Included in the Stipulation is Stone's statement that he does "not agree that he was a

There was also evidence that Stone was present at the "office" on two occasions. With respect to Stone, the expert stated that he "operated as a bookmaker associated with defendant Francesco Scibelli and acted on behalf of defendant Scibelli as a conduit of sports wagering information to Pradella for the purpose of influencing Pradella's operation of the 'office'." Commenting specifically on the phone call between Stone and Pradella, Agent Harker stated his opinion that Stone placed this call "at the request of defendant Scibelli, . . . and informed [Pradella] as to two teams which someone referred to as 'the guy' chose as most likely to beat a certain point spread. . . . This information was utilized by Pradella when he adjusted the line in a discussion with Torino at 11:39 a. m. on the same day . . . ." The expert's opinions regarding Stone's involvement in the larger gambling operation do not suffer from the alleged weaknesses in his opinions with respect to appellant Bruno's participation, *see* note 7, *supra*; for the most part they are clearly based on facts apparent in the Stipulation.[9] Evidence of the October 22, 1974, discussion between Stone and Sacco supports the conclusion that Stone was a bookmaker and was associated with Scibelli. The "Expert Analysis" of the conversation between Stone and Pradella indicates that Stone was passing Pradella important line information, and evidence presented elsewhere in the Stipulation provides a basis for Agent Harker's conclusion that Pradella used this information to adjust the line at the office. This evidence was sufficient to convict Stone of the substantive offense of conducting "an illegal gambling business" and of

conspiracy to conduct such a business. *See United States v. DiMuro, supra,* 540 F.2d at 508.

*Affirmed.*

participant in this conversation . . . ." Countering this assertion is Agent Ringgold's statement in the Stipulation that "based upon all his familiarity with Stone's voice and from listening to the [voice] exemplar [given by Stone] Ringgold identifies Stone as a participant in the telephone conversation with Defendant Daniel Sacco occurring on October 22, 1974 . . . ." Considering the evidence most favorably to the Government, we must conclude that the district court credited Agent Ringgold's identification of Stone's voice and

found that Stone participated in this conversation.

9. Only the expert's conclusion that Stone called Pradella "at the request of Scibelli" and acted "as a conduit of sports wagering information to Pradella" is arguably unsupported by evidence in the Stipulation, and we therefore do not rely on this part of the expert's opinion in considering whether sufficient evidence exists connecting Stone to the larger operation. *See* note 7, *supra.*