UNITED STATES of America, Plaintiff,

v.

Hector MORA, et al., Defendants.

Crim. No. 85–210–C.

United States District Court,
D. Massachusetts.

Nov. 27, 1985.

distribute cocaine. The defendant Hector Mora, joined by the other nine defendants in the case, has moved to suppress all evidence gathered as a result of electronic surveillance of two of the defendants. The electronic surveillance was conducted from March 23, 1985 through April 6, 1985, and from May 7, 1985 through May 16, 1985, pursuant to orders from the Massachusetts Superior Court authorizing the interception of wire communications over two separate telephone lines. The defendants claim that their rights under the Fourth Amendment to the United States Constitution, Article XIV of the Massachusetts Declaration of Rights, 18 U.S.C. §§ 2510–2520, and Mass. Gen. Laws c. 272, § 99 were violated by alleged irregularities and deficiencies in the applications for authorization of electronic surveillance, in the authorizations themselves, and in the execution of the Superior Court orders.

## BACKGROUND

On January 6, 1985, an officer of the Medford Police Department stopped and questioned a young male exiting from a condominium complex about a bulge in the upper part of his jacket. In response to an inquiry from the officer, the young man, later determined to be Elkin Mora, showed the officer a large amount of United States currency, stating that the money belonged to his brother, the defendant Hector Mora. While still at the same location, the officer and his supervisor were approached by Hector Mora, who stated that he had papers to prove the money belonged to him. The officers and Elkin Mora then proceeded to the Medford Police Station, where the currency was counted, and found to be $15,000 in hundreds, fifties, twenties and tens, divided into bundles of $1,000 each.

Shortly thereafter, Hector Mora arrived at the station, accompanied by three other individuals, including the defendant, Juan Guillermo Valencia ("Valencia"). Hector Mora ("Mora") proffered receipts for $8,000, alleging that the money came from contracts for the services of musicians whom he represented as an agent. The

## MEMORANDUM

CAFFREY, Chief Judge.

Defendant Hector Mora has been charged in five counts of a six-count indictment with conspiracy to possess with intent to distribute a quantity of a controlled substance, cocaine; with possession of cocaine with intent to distribute; and with unlawful use of a telephone to cause, facilitate and commit a conspiracy with intent to

contracts covered work performed in August and September of 1984. Mora also showed the officers a pay stub from Gregstrom Corporation of Woburn, Massachusetts, stating he was an employee there. Both Mora and Valencia then voluntarily had their photographs taken, and the $15,000 was returned to Mora. Later investigation showed that a manager at Gregstrom Corporation could not identify the photograph of Hector Mora as that of an employee.

Subsequently, this incident was related to Thomas J. Quigley ("Quigley"), a Massachusetts State Police officer assigned to the Middlesex County Narcotic Task Force, and an investigation commenced. Law enforcement officials began a two-month, physical surveillance of the condominium complex and other residences frequented by Mora and Valencia. On January 19, 1985, Mora and Valencia were followed to a residence in Central Falls, Rhode Island, which a Drug Enforcement Administration (DEA) agent stated was occupied by the defendant, Oscar Usuga. The agent informed Quigley that the DEA considered Oscar Usuga and the club he owned, La Fuente, to be involved in the distribution of cocaine. Later that evening, Valencia also went to an establishment which, according to DEA intelligence, was a "hang out" for cocaine distributors. Other efforts at physical surveillance of Valencia proved fruitless due to Valencia's erratic driving practices, which officers characterized as counter-surveillance techniques. For example, on February 5, 1985, an attempt to covertly follow Valencia failed when Valencia drove his car at high speeds and made unsignalled, sudden turns. In addition to following the suspects, on one occasion officers on surveillance recovered trash discarded by an individual associated with the defendants which included a partially torn envelope with notations which, in the opinion of Quigley and other narcotics officers, referred to prices and weights of cocaine.

During February and March of 1985, Quigley also met with two informants who gave him information about the defendants in this case. According to Quigley, the first, Mr. X, an admitted cocaine user and distributor, provided information which led to the arrest of certain named individuals on narcotics charges and receiving stolen property. Mr. X alleged that his supplier of cocaine, "Mr. Green," dealt directly with a man called "GeJarno," and that he, Mr. X, had been present on several occasions when Mr. Green met with GeJarno to buy cocaine, although he was not in the room or car when the two conducted business. Mr. X identified GeJarno as the defendant Valencia from the photograph taken by the Medford Police Department.

The second informant, Mr. Y, a cocaine dealer, provided Quigley with his own personal records and ledgers concerning his cocaine transactions. One page of his telephone journal contained the name GeJarno, two telephone numbers and a beeper number. Mr. Y stated that he had purchased large quantities of cocaine from GeJarno over several months. In addition to identifying Valencia as GeJarno from the photographs taken by the Medford Police, Mr. Y identified the photograph of Hector Mora as that of one of Valencia's associates. The telephone numbers attributed to GeJarno were listed to Magola Valencia and Gloria P. Valencia. The informants said they were unwilling to introduce an undercover officer into the group or to testify because they feared for the safety of themselves and their families.

As part of the investigation, officers obtained the telephone toll records for the telephone number (617) 459–2942, allegedly used by GeJarno and subscribed to by Gloria P. Valencia. An analysis of the toll calls made between August 1984 and February 1985 revealed numerous calls to and from residences of persons arrested in connection with the possession of cocaine and other controlled substances, or of persons considered by the DEA to be involved in cocaine distribution. In addition, there were 15 calls to Florida, 79 to Colombia, and an unspecified number to pay phones.

Further investigation was made of the defendants' financial transactions. An in-

terview with a real estate agency revealed that when Hector Mora purchased a condominium in 1984 for $76,930, he stated that he would make the monthly payments in cash, and in fact tendered $11,630 in cash. Mora was advised that cash would not be accepted and that he was required to use a newly opened checking account. Mora also purchased two automobiles in 1984, both apparently with cash, for a total of $16,010.

On the basis of the foregoing, Quigley and other law enforcement personnel concluded that normal investigative techniques would not lead to the acquisition of sufficient evidence to successfully prosecute the alleged conspiracy to possess and distribute controlled substances. On March 22, 1985, therefore, Assistant District Attorney Alexander Z. Nappan ("ADA Nappan") was specially designated pursuant to Mass.Gen. Laws c. 272, § 99(F)(1) by Middlesex District Attorney Scott Harshbarger to apply to the state court for a warrant authorizing the interception of certain wire communications by Valencia over telephone line (617) 459–2942. The application was approved and an order and warrant issued on the same day pursuant to Mass.Gen.Laws c. 272, § 99.

In the interception order, the state court judge stated that he found probable cause to believe that Valencia was engaged in an ongoing conspiracy to possess and sell narcotics or harmful drugs, specifically cocaine, and that evidence obtained by the interception of wire communications, or a wiretap, would aid in the apprehension of Valencia and others involved in the conspiracy. The court also determined that normal investigative procedures had been tried and were unlikely to succeed. The order provided that the interception not exceed 15 days in total; that the warrant terminate 30 days after issuance; and that, within that period, the warrant continue until the full scope of the conspiracy to violate Mass.Gen.Laws c. 94C, §§ 32A, 32E, 34 and 40 as they relate to cocaine was revealed. The terms of the order required the use of reasonable steps to minimize unnecessary intrusion into the callers' right to privacy. All conversations of a clearly non-criminal nature were not to be recorded or monitored except for an initial 60 second period and, thereafter, random 15 second spot checks to determine if the conversations had become criminal in nature, if one of the named conspirators had joined the conversation, or if other unnamed persons were engaged in criminal conversations. Unless a Spanish-speaking interpreter was present, all conversations in Spanish were presumed to be non-criminal. Conversations in which Valencia, the only person named in the warrant, was a party and which were criminal in nature could be recorded in their entirety. Conversations involving persons not named as co-conspirators which concerned the designated narcotic offenses, or conversations regarding other criminal offenses could also be intercepted, with the proviso that they be reported to the state court in the next status report. The original tapes were to be sealed daily, stored by law enforcement officers and returned to the issuing judge in accordance with Mass.Gen.Laws c. 272, § 99(L)(3). ADA Nappan was to report to the court on the status of the interceptions every fifth day.

Interception of (617) 459–2942 began on March 23, 1985 and continued 24 hours a day for fifteen consecutive days until midnight, April 6, 1985. Each police officer assigned to the investigation was told to read and sign written instructions concerning minimization, and was informed that Valencia a/k/a GeJarno was the target and that the goal of the investigation was to uncover Valencia's cocaine distribution network. Two Spanish-speaking law enforcement persons were assigned to the listening post. Their job was to simultaneously translate into English conversations in Spanish overheard during the wiretap so that minimization monitors could determine whether or not the conversations were criminal in nature and thus could be intercepted. The interpreters also transcribed the interceptions into English, using cassette work tapes. The communications were simultaneously recorded on one reel-

to-reel tape recorder and three cassette tape recorders.

The reel-to-reel tapes, considered the original tapes, were sealed daily and, at the termination of the interception, were placed in an alarmed, limited access evidence vault in the state police office building. ADA Nappan made the status reports as required. The warrant and original tape recordings were returned to the issuing judge for judicial sealing on April 26, 1985, twenty days after the interception terminated.

On April 30, 1985, ADA Nappan was again specially designated to apply for a warrant authorizing the interception of certain wire communications of Mora and Valencia over telephone line (617) 391–3718, Mora's residential telephone. The submitted application was based on information gained during physical surveillance, conversations intercepted during the first electronic surveillance, and analysis of the records of tolls calls made from Mora's home phone. An order, essentially the same as the first one, issued on May 3, 1985, naming Mora and Valencia as the alleged co-conspiractors, and authorizing the interception of telephone line (617) 391–3718.

The second interception commenced on May 7, 1985, and continued for ten consecutive days until midnight May 16, 1985. It was conducted in much the same manner as the first interception, except that officers assigned to the listening post were instructed that both Mora and Valencia were targets. Two interpreters were again used as part of the minimization effort, one of whom had worked on the first interception. Although the investigation began as a solely state matter and both interceptions were controlled by state authorities, advice and financial support was sought from the federal government during the first wiretap, and, toward the end of the second interception, law enforcement personnel decided to prosecute the case in federal court.

On May 16, 1985, state police officers and DEA agents arrested Mora, Valencia and others. The original tape recordings from the second interception were taken to the state police evidence vault. The warrant and original tapes were returned by ADA Nappan and Quigley to the state court for judicial sealing on June 25, 1985, forty-one days after the conclusion of the second interception.

## DISCUSSION

### A. APPLICABLE LAW

■ The first issue is whether federal or Massachusetts law controls. I rule that Massachusetts law applies to the challenges to the sufficiency of the applications for the warrants to intercept wire communications and to the adequacy of the state orders. Federal law applies to the questions on the timeliness of the return and judicial sealing of the original tape recordings, and on the government's failure to seek judicial approval before using the tapes, authorized to gather evidence of state offenses, in order to obtain indictments on federal crimes.

An important distinction exists between procedures governing the interception of wire communications and those governing the preservation of such evidence for trial. *United States v. Sotomayor*, 592 F.2d 1219, 1225 (2d Cir.1979), *cert. denied* 442 U.S. 919, 99 S.Ct. 2842, 61 L.Ed.2d 286 (1979). The state has an important interest in protecting its residents' right to privacy, and when a federal court considers the admissibility of wiretap evidence obtained by state officers acting pursuant to a state order issued under a state statute, the more stringent state statutory requirements should be applied.[1] *Id.* The testimony in this case shows that the investigation was primarily a state matter. State personnel conducted the physical surveillance, sought and obtained in state court the wiretap warrants under state law, and

---

**1.** The federal statute governing wiretapping by federal and state authorities allows states to adopt more stringent, but not more lenient, requirements. *See, e.g. United States v. Smith*, 726 F.2d 852, 856 (1st Cir.1984).

monitored the interceptions. It was not until some point late in the second interception that it was decided federal authorities would take over and prosecute the case. This was not a joint investigation by state and federal agents. I rule that state law should therefore control the issues regarding the lawfulness of the wiretap.

Rules pertaining to the admissibility of evidence are, however, usually governed by the law of forum. *Id.* Although sealing requirements may be important to a state statutory scheme, their purpose is only to assure that no tampering with the tapes occurs. *Id.* at 1226. The sealing requirement, a post-interception procedure, relates solely to the preservation of evidence. *Id.* The federal interest in establishing its own standards for the admission of evidence gained through lawfully conducted interceptions of wire communications outweighs the interest a state may have in obtaining federal enforcement of the state's sealing requirements. *Id.* Challenges on post-interception issues will therefore be decided under federal law.

## B. SUFFICIENCY OF THE WARRANT APPLICATIONS

When reviewing the sufficiency of wiretap applications, the practice in the First Circuit is not to review the application *de novo*. *United States v. Smith*, 726 F.2d 852, 864 (1st Cir.1984). Instead, the court looks at the application in a practical and commonsense manner to see if it includes facts at least minimally adequate to support the findings made by the issuing judge. *Id., citing United States v. Scibelli*, 549 F.2d 222, 226 (1st Cir.1977), *cert. denied*, 431 U.S. 960, 97 S.Ct. 2687, 53 L.Ed.2d 278 (1977).

Under Massachusetts law, a warrant to intercept wire communications may issue only

> [u]pon a showing by the applicant that there is probable cause to believe that a designated offense has been, is being, or is about to be committed and that evidence of the commission of such an offense may thus be obtained or that infor-

mation which will aid in the apprehension of a person who the applicant has probable cause to believe has committed, is committing, or is about to commit a designated offense may thus be obtained....

Mass.Gen.Laws c. 272, § 99(E)(2). The application for such a warrant must contain a statement of facts establishing probable cause. Mass.Gen.Laws c. 272, § 99(F)(2)(a) and (b). Affidavits of persons other than the affiant may be submitted. Mass.Gen. Laws c. 272, § 99(F)(3). The probable cause finding by the issuing court is entitled to substantial deference by the reviewing court. *E.g., Spinelli v. United States*, 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637 (1969); *Commonwealth v. Upton*, 394 Mass. 363, 377, 476 N.E.2d 548 (1985). This principle applies in wiretap cases. *See, e.g. United States v. Martino*, 664 F.2d 860, 869 (2d Cir.1981), *cert. denied*, 458 U.S. 1110, 102 S.Ct. 3493, 73 L.Ed.2d 1373 (1982). When evaluating a warrant to determine whether or not it was issued on the basis of probable cause, a court may rely on reasonable inferences and common knowledge. *Commonwealth v. Atchue*, 393 Mass. 343, 346, 471 N.E.2d 91 (1984). The determination of probable cause is not a determination of guilt beyond a reasonable doubt. *Id.* at 345–46, 471 N.E.2d 91. Rather, probable cause connotes " 'a reasonable ground for belief....' " *Commonwealth v. Vynorius*, 369 Mass. 17, 23, 336 N.E.2d 898 (1975).

█ The probable cause finding in the first wiretap warrant was presumedly based upon Quigley's affidavit and its supporting documents. In cases involving the interception of wire or oral communications, a court looks at the affidavits underlying the warrant as a whole, reading them in a "commonsense and realistic fashion." *Commonwealth v. Vitello*, 367 Mass. 224, 272, 327 N.E.2d 819 (1975), *quoting United States v. Ventresca*, 380 U.S. 102, 108, 85 S.Ct. 741, 745, 13 L.Ed.2d 684 (1965). The defendants argue that the Quigley affidavit relies heavily upon information provided by informants and that the informants' relia-

bility was inadequately established. The Massachusetts wiretap law specifically provides:

> ... If the facts establishing such probable cause are derived in whole or part from the statements of persons other than the applicant, the sources of such information and belief must be either disclosed or described; and the application must contain facts establishing the existence and reliability of any informant and the reliability of the information supplied by him. The application must also state, so far as possible, the basis of the informant's knowledge or belief....

Mass.Gen.Laws c. 272, § 99(F)(3).[2] Assuming that the section on informant data was crucial to the sufficiency of the affidavit, the reliability of the informants and the basis of their knowledge must be established. Independent police corroboration can overcome deficiencies in either element of this requirement. *Commonwealth v. Upton*, 394 Mass. at 376, 476 N.E.2d 548.

The first prong, the reliability or veracity test, may be satisfied by recounting the informant's past performance in providing information which led to the arrest and conviction of an individual or to the recovery of contraband or stolen goods. *Commonwealth v. Kaufman*, 381 Mass. 301, 302, 408 N.E.2d 871 (1980); *Commonwealth v. Vynorius*, 369 Mass. at 21, 336 N.E.2d 898. An informant's admissions against his penal interest, such as an admission to participation in violations of drug laws, may also show sufficient credibility, to support a finding of probable cause. *Commonwealth v. Vynorius*, 369 Mass. at 21, 336 N.E.2d 898. Other information in the affidavit corroborating the informant's statements provides additional

indicia of reliability. *Id.* The second prong, the basis of knowledge requirement, can be satisfied if the informant's statements contain sufficient detail from which a judge may infer that the information was trustworthy. *E.G. Spinelli v. United States*, 393 U.S. at 416–17, 89 S.Ct. at 589–90, *Commonwealth v. Kiley*, 11 Mass.App. 939, 939, 416 N.E.2d 980 (1981).

In this case, the information in Quigley's affidavit satisfies the reliability and basis of knowledge requirements for informant statements. The first informant, Mr. X, against his penal interest, admitted to being a distributor of cocaine. Information he gave to law enforcement officers led to the arrest of other persons. His statements concerning GeJarno a/k/a Valencia, were corroborated by independent police investigation. For example, Mr. X observed Valencia driving a silver Datsun 280Z with black shutters in the rear window. Police investigation revealed that Valencia drove such a vehicle. The basis of Mr. X's knowledge was adequately demonstrated to be from personal observation of Valencia and from conversations with his supplier, Mr. Green. The second informant, Mr. Y, against his penal interest, also admitted to being a cocaine dealer, and identified a Colombian named GeJarno as his supplier. According to Mr. Y, he contacted GeJarno at (617) 459–2942. Shown the photograph of Valencia taken by the Medford police, Mr. Y identified it as Ge-Jarno. He also identified the photograph of Hector Mora as an associate of Valencia's. Police officers listened in when Mr. Y made a call to (617) 459–2942, asked for GeJarno, was told he was not there at that time, and left a message that he wanted some "product." Mr. Y's information con-

---

**2.** In addition, the defendants contend that their rights under Article 14 of the Massachusetts Declaration of Rights were violated. The Supreme Judicial Court of Massachusetts ruled in *Commonwealth v. Upton*, 394 Mass. 363, 373, 476 N.E.2d 548 (1985), that Article 14 afforded defendants more substantive protection than does the Fourth Amendment of the United States Constitution. The court rejected the "totality of the circumstances" test enunciated in *Illinois v. Gates*, 462 U.S. 213, 230, 103 S.Ct.

2317, 2328, 76 L.Ed.2d 527 (1983), concluding that the *Aguilar-Spinelli* two prong test, as developed under *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), was a more appropriate standard for probable cause inquiries under Article 14. The standard included in Mass.Gen. Laws c. 272 § 99F(3) parallels the *Aguilar-Spinelli* test.

cerning the telephone number (617) 459–2942 was corroborated by analysis of telephone records which showed that the number was listed to Valencia's sister and revealed a pattern of use consistent with sellers of cocaine. The basis of Mr. Y's knowledge was personal contact with the defendants.

The informants' statements clearly could be considered when determining probable cause. Looking at the documents submitted to the state court with the application for the first wiretap warrant, I rule that there are sufficient facts to find probable cause that interception of (617) 459–2942 would result in evidence that Valencia and unnamed others were participants in a conspiracy to violate Massachusetts controlled substance laws.

The application for the second warrant also contained sufficient facts to establish probable cause. The affidavit submitted by Quigley in support of the second application recounted observations made during physical surveillance of Mora and Valencia, details concerning Mora's claims to the $15,000 in cash found on his brother by the Medford police, Mora's purchases of two automobiles and payment in cash of the deposit on a condominium, and the failure of Gregstrom Corporation to identify him as the employee he claimed to be. Furthermore, during the first interception of (617) 459–2942, conversations between Mora and Valencia were recorded which, as analyzed by experienced law enforcement narcotics investigators, showed that Mora was an important figure in the cocaine distribution network under investigation. The affidavit also contained an analysis of toll calls made from Mora's home phone, (617) 391–3718, which indicated use consistent with that of a drug trafficker, such as a substantial number of calls to and from pay phones, and calls to persons known to be drug dealers. I therefore rule that there are sufficient facts for a finding of probable

cause that interception of (617) 391–3718, Mora's home phone, would reveal evidence of a conspiracy to violate the Massachusetts controlled substance laws.

Defendants also argue that the applications do not establish that normal investigative techniques were ineffective, or not likely to succeed. Massachusetts law provides that a warrant for a wiretap may issue only "[u]pon a showing by the applicant that normal investigative procedures have been tried and have failed or reasonably appear unlikely to succeed if tried." Mass.Gen.Laws c. 272, § 99(E)(3). The federal analog to section 99(E)(3) is 18 U.S.C. § 2518(c), and has virtually identical language.[3] The purpose of this requirement is "to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime," *United States v. Kahn*, 415 U.S. 143, 153 n. 12, 94 S.Ct. 977, 983 n. 12, 39 L.Ed.2d 225 (1974), and to safeguard against the use of wiretapping as an initial step in the investigative process. *United States v. Giordano*, 416 U.S. 505, 515, 94 S.Ct. 1820, 1826, 40 L.Ed.2d 341 (1974). Traditional surveillance techniques need not be exhausted before application for a wiretap is made. *E.g., United States v. Scibelli*, 549 F.2d at 226. What the provision does require is that the applicant inform the issuing judge of the difficulties involved in using traditional investigative techniques. *Id.* at 227, *quoting United States v. Pacheco*, 489 F.2d 554, 565 (5th Cir.1974), *cert. denied*, 421 U.S. 909, 95 S.Ct. 1558, 43 L.Ed.2d 774 (1975). The court, in deciding whether an application has satisfied the statute, may consider the nature of the crime. *United States v. Scibelli*, 549 F.2d at 227.

In this case, Quigley's affidavits detailed police efforts at physical surveillance and the difficulties encountered due to the evasive tactics of the suspects. In the affi-

**3.** 18 U.S.C. § 2518(c) requires: "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous...."

No case has been cited to this Court under the Massachusetts statute.

davits, Quigley, an agent experienced in drug investigation, also explained that attempts to infiltrate the organization would be unsuccessful because the participants were cautious and only willing to deal with people they knew or who were recommended by trusted individuals. Neither of the informants was willing to take the risk of introducing an undercover agent or of testifying against members of the group. Telephone records were also obtained and analyzed prior to the application. The analyses revealed a pattern of use consistent with the type of crime under investigation, the distribution of controlled substances. Traditional methods of investigation did not, however, produce enough evidence to prosecute the targeted conspiracy and, due to the nature of the crime, was unlikely to be more fruitful in the future. Reviewing the information in the affidavits, I rule that sufficient facts were stated to establish that normal investigative techniques had been unsuccessfully pursued and were unlikely to succeed in the future.

The applications for the warrants provided sufficient information to support the issuing judge's statutorily required findings. The second affidavit is not merely a roll-over of the first. It contains new information obtained from the first wiretap and from analysis of the toll call records of the second telephone number targeted for interception. *See, United States v. Vazquez*, 605 F.2d 1269, 1282 (2d Cir.1979), *cert. denied*, 444 U.S. 981, 1019, 100 S.Ct. 484, 674, 62 L.Ed.2d 408, 649 (1979).

## C. ORDERS AUTHORIZING ELECTRONIC SURVEILLANCE

■ Defendants argue that the orders authorizing the interceptions were facially invalid. First, the defendants contend that the instructions regarding minimization were ambiguous. Law enforcement officers involved in the wiretap testified that they did not find the instructions ambiguous, and neither do I. I rule that the instructions fully satisfy the statutory requirement in Mass.Gen.Laws c. 272, § 99, as construed by *Commonwealth v. Vitello*,

367 Mass. at 266, 327 N.E.2d 819 for specificity and clarity.

Second, the defendants argue that the orders' conclusory statement concerning the ineffectiveness of normal investigative techniques was inadequate because it did not delineate the court's reasoning underlying that determination. The Massachusetts statute covering this issue requires that the applicant, not the court, show facts sufficient to support such a finding. Mass. Gen.Laws c. 272, § 99(E)(3). It does not require that the order itself recite the basis for the court's decision.

Third, the defendants argue that the orders do not require return of the tapes to the issuing judge at the termination of the interception period. Under Massachusetts law, the return is to be made within seven days. Mass.Gen.Laws c. 272, § 99(M). This section was reconciled with the federal statute, 18 U.S.C. § 2518(8)(a), which requires an immediate return, in *Commonwealth v. Vitello*, 367 Mass. at 267, 327 N.E.2d 819. The orders in this case required that "the return of this warrant with your doings thereon be done according to G.L. c. 272, § 99L(3) and M." I rule that this statement is sufficient. I also note that Mass.Gen.Laws c. 272, § 99(I), which lists the components required in a warrant, does not require information on method and time of return.

Fourth, the defendants attack the orders' provision for sealing the tapes. The orders call for sealing the tapes daily by a designated officer. This requirement is in addition to, and does not supplant, judicial sealing at the termination of the interception as a whole. It provides greater protection against possible tampering, and did not affect the validity of the orders.

Finally, the defendants contend that the orders fail to adequately identify the agency authorized to intercept and monitor the telephone conversations as required by implication in Mass.Gen.Laws c. 272, § 99. *See Commonwealth v. Vitello*, 367 Mass. at 260, 327 N.E.2d 819. As noted in *Vitello*, directing an order to the district attorney, his specially designated assistant dis-

trict attorney, or his designated agents fufills this requirement. *Id.* at 260 n. 18, 327 N.E.2d 819. The orders in this case were addressed to District Attorney Scott Harshbarger, ADA Nappan, and their investigative and law enforcement officers, thereby complying with the requirement enunciated in *Vitello.*

I rule that the orders of March 22, 1985 and May 13, 1985 authorizing the interception of wire communications over (617) 459–2942 and (617) 391–3718, respectively, are facially valid.

### D. ADEQUACY OF MINIMIZATION DURING EXECUTION OF ORDERS

■ The defendants argue that telephone calls were inadequately minimized during both interceptions. In support of this contention, they note the use of Colombian slang and code words, the rapid pace of spoken Spanish, and the difficulty facing interpreters who try to simultaneously listen to and translate Spanish conversations into English.

The purpose of minimization is to limit the great intrusion into an individual's privacy which is inherent in electronic surveillance. *Commonwealth v. Vitello,* 367 Mass. at 262, 327 N.E.2d 819. Extensive surveillance may be justified, however, when investigators suspect a widespread conspiracy. *Scott v. United States,* 436 U.S. 128, 140, 98 S.Ct. 1717, 1724, 56 L.Ed.2d 168 (1978). This is particularly true with a wiretap on a residential phone used by a person thought to be an important figure in a conspiracy to distribute controlled substances. *See id.* Jargon and code words are often used by persons dealing unlawfully in controlled substances to mask the purpose of a communication. *E.g., United States v. Quintana,* 508 F.2d 867, 874–75 n. 6 (7th Cir.1975). Another evasive technique is to deliberately begin a conversation with discussions of irrelevant matters, so that if calls are being monitored, interception will cease under the assumption the call is non-criminal in nature. *Id.* Consequently, during a wiretap involv-

ing a drug conspiracy, it may be necessary to listen to more calls to discover the import of certain words or slang, and to spot-check non-criminal calls more often to see if originally innocent calls have turned to discussion of criminal matters. *See United States v. Capra,* 501 F.2d 267, 273, 276 (2d Cir.1974), *cert. denied,* 420 U.S. 990, 95 S.Ct. 1424, 43 L.Ed.2d 670 (1975). Interception of a high percentage of non-criminal calls does not necessarily indicate improper minimization. *Scott v. United States,* 436 U.S. at 140, 98 S.Ct. at 1724.

The orders in this case, as noted above, limited interception to calls involving designated persons and criminal offenses, and provided guidelines for intermittant monitoring of non-criminal calls for specific purposes. The evidence shows that the monitors adhered to these instructions. Although the interpreters were not Colombian themselves, they were fluent in Spanish and quickly learned Colombian slang. A sincere effort was made to interpret the conversations word for word as they were intercepted so that the minimization monitors, persons familiar with narcotics trafficking, could decide whether or not the conversations were interceptable under the court order. One of the interpreter's testified she lost no more than 20% of the words when interpreting. I find that at the very least, the interpreters successfully relayed the "gist" of each conversation. During a four-minute tape of a non-criminal conversation played before the court, eleven separate interruptions were clearly audible. ADA Nappan testified to hearing such interruptions throughout the tapes, which indicates that non-criminal conversations were not recorded in their entirety. Although defendants presented statistics concerning the number of criminal and non-criminal calls intercepted and have translated the tapes themselves, they offered no figure representing that any calls were improperly minimized.

I rule that, on the evidence before the court, the minimization process was conducted properly under the court orders in question and fulfilled the intent of the law.

## E. RETURN AND SEALING OF TAPES

Under federal law, recordings made pursuant to a wiretap order must be returned to the issuing judge for sealing immediately after termination of the interception. 18 U.S.C. § 2518(8)(a).[4] The Massachusetts statute provides that a return must be made within seven days. Mass.Gen.Laws c. 272, § 99(M). The Massachusetts provision was construed in *Commonwealth v. Vitello* to mean that seven days was the "outside limit on return of the warrant," but that returns should be made before then if practicable. *Commonwealth v. Vitello*, 367 Mass. at 267, 327 N.E.2d 819. Although ADA Nappan apparently considered himself governed by state law when he made the returns, it is clear that the returns were tardy under either law.

The measurement of the delay in return and sealing of tapes under federal law begins from the termination date of the continuous period of interception of a telephone line. *United States v. Vazquez*, 605 F.2d 1269, 1276 (2d Cir.1979). In this case, ADA Nappan made the return of the first wiretap on April 26, 1985, twenty days after the interception terminated, and of the second wiretap on June 25, 1985, forty-one days after termination of the second interception. A delay beyond one or two days requires a satisfactory explanation before the tapes may be used in court. *Id.* at 1278.

No clear consensus exists as to what constitutes a satisfactory explanation. *Id.* Each case is decided on its own facts. *E.g., United States v. Caruso*, 415 F.Supp. 847, 851 (S.D.N.Y.1976), *aff'd*, 553 F.2d 94 (2d Cir.1977). Some of the factors considered by the courts are the length of the delay; the presence or absence of evidence of tampering; administrative delays caused by the need to duplicate and prepare tapes for sealing; and whether the defendants were prejudiced by the delay. *United States v.*

*McGrath*, 622 F.2d 36, 42–43 (2d Cir.1980). Other reasons for delay found excusable have been the prosecutor's preoccupation with preparations for an upcoming trial, *United States v. Scafidi*, 564 F.2d 633, 641 (2d Cir.1977), *cert. denied*, 436 U.S. 903, 912, 98 S.Ct. 2231, 2252, 56 L.Ed.2d 401, 413 (1978) (seven days), and the time needed to prepare warrants, indictments and transcripts of the tapes. *United States v. Diana*, 605 F.2d 1307, 1314–15 (4th Cir. 1979), *cert. denied*, 444 U.S. 1102, 100 S.Ct. 1067, 62 L.Ed.2d 787 (1980) (39 days). For an explanation to be deemed satisfactory, it must show that the government acted with dispatch and all reasonable diligence, respectful of the letter and spirit of the law and mindful of the court's instructions. *United States v. Angelini*, 565 F.2d 469, 472 (7th Cir.1977), *cert. denied*, 435 U.S. 923, 98 S.Ct. 1487, 55 L.Ed.2d 517 (1978). What was a satisfactory excuse in the past, may not suffice today. *United States v. Vazquez*, 605 F.2d at 1280. As the case law on the issue grows, sealing delays become less justifiable. *Id.* Law enforcement personnel are expected to learn from their own experiences and those of others. *Id.*

Turning to the facts in the case now before this Court, I rule that the government's explanation for the sealing delays are not satisfactory. At issue here are not *de minimis* delays; but the failure for twenty and forty-one days to return to the court the evidence obtained during the two interceptions. The government cited no administrative problems occasioned by its need to use the original tapes. In fact, transcription and duplication of the tapes was done at the listening post. ADA Nappan's assertion that he interpreted the law and warrant as meaning that the returns were due thirty days after the date the warrant was signed is not supported by a careful reading of the court orders or the statutes, or by any case law. Having par-

---

**4.** 18 U.S.C. § 2518(8)(a) provides in pertinent part:

"... Immediately upon the expiration of the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions...."

ticipated in three prior wiretaps, ADA Nappan was not a novice to the law. Even under his interpretation, the second return was tardy. The law does not exclude weekends and holidays when measuring the length of a sealing delay. In addition, the government advanced ADA Nappan's unavailability due to preoccupation with pending trials as a justification for the delays. It is clear from the facts, however, that the ADA was not on trial continuously during the delay periods and that there was ample opportunity for him to make the returns more expeditiously. The government also failed to establish that either Quigley or the issuing judge was unavailable during the relevant time period. In any event, other personnel could have been designated to effectuate the returns if necessary. *See United States v. Angelini*, 565 F.2d at 472 (if case agent unavailable, another agent can fulfill sealing obligation); *United States v. Poeta*, 455 F.2d 117, 122 (2d Cir.), *cert. denied*, 406 U.S. 498, 92 S.Ct. 2041, 32 L.Ed.2d 337 (1972) (tapes may be properly sealed by another judge when issuing judge unavailable); *United States v. Caruso*, 415 F.Supp. at 850 (another assistant district attorney may make return when person originally designated unavailable).

The Courts of Appeals for the circuits differ on whether an inadequate explanation of a delay should result in suppression of the tapes. For example, the Fifth Circuit held that an unexplained delay did not warrant suppression where there was no evidence of tampering and where the defendants were not prejudiced by the delay. *United States v. Diadone*, 558 F.2d 775, 780 (5th Cir.1977), *cert. denied*, 434 U.S. 1064, 98 S.Ct. 1239, 55 L.Ed.2d 765 (1978) (two week delay). Similar is the two-step analysis adopted by the Court of Appeals for the Seventh Circuit. Under this approach, if the government offers a satisfactory explanation, then the delay is excused, but if there is no satisfactory explanation, then the court looks to see (1) if the purpose of the sealing procedure was nevertheless satisfied; and (2) if the statutory requirement was deliberately ignored, and if so, whether the government gained any tactical advantage. *United States v. Angelini*, 565 F.2d at 471. In contrast, the Courts of Appeals for the Second and D.C. Circuits, have held that defendants need not prove tampering for obtaining suppression based on an unexplained delay in returns. *United States v. Johnson*, 696 F.2d 115, 124–25 (D.C.Cir.1982); *United States v. Gigante*, 538 F.2d 502, 505 (2d Cir.1976). The First Circuit has not as yet ruled on this issue.

I find that ADA Nappan's failure to make his return promptly was caused by his lack of appreciation of the importance to his case of complying with the statutory requirements for making a return. I find that he acted in ignorant bliss and negligently but that he was not consciously or deliberately failing to perform his duty, nor was he acting in bad faith. As was observed by Mr. Justice White in his concurring opinion in *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), courts should be sensitive to the costs and benefits when imposing an exclusionary remedy. *Id.* at 257, 103 S.Ct. at 2341. The cost of barring the use of relevant and trustworthy evidence is interference with the truthseeking function of a criminal trial. *Id.* Thus any denial of jury access to highly probative and reliable evidence must be justified and must be limited to situations which further the purpose underlying the rule. *Id.* at 257–58, 103 S.Ct. at 2342.

The post-interception procedural requirements contained in 18 U.S.C. § 2518(8)(a) aim "to preserve the integrity of the intercepted conversations and to prevent any tampering or editing of the tapes or other unlawful use." *United States v. Lawson*, 545 F.2d 557, 564 (7th Cir.1975). Applying the two-part test set out in *United States v. Angelini*, 565 F.2d at 471, I find on the record before me that the purposes of the sealing requirements were fulfilled in this case. Each tape was sealed at the end of the recording day. The tapes, after sealing, were all stored in an alarm-protected and secure vault in an office occupied by the state police investigators. All of these

individually sealed tapes were ultimately sealed in large cartons by Judge Zobel and were produced in Court in those ame, still-sealed cartons. No evidence of any tampering with the tapes was hinted at or presented to the Court. The testimony at the hearing also established and I find that no prejudice has resulted to the defendants from the sealing delays, nor has any tactical advantage accrued to the government.

Defendants also argue that the Superior Court judge failed to properly seal the tape recordings. They base this claim upon the fact that the judge did not inspect and seal each tape individually. Instead, each tape was sealed by the designated officer and the box containing all the sealed tapes was examined and sealed by the judge. I find that the seal on the box assured that no one could or would have access to the tapes without authorization. The federal law provides that the recordings shall be sealed under the issuing judge's directions. 18 U.S.C. § 2518(8)(a). It does not delineate a specific procedure for sealing. In this case, I rule that the method used fulfilled the purpose of the provision and assured the integrity of the tapes. I therefore rule that the tapes were properly sealed by Judge Hiller Zobel.

### F. FAILURE TO OBTAIN JUDICIAL APPROVAL

Finally, the defendants argue that because the wiretap warrants specified state and not federal crimes, the prosecutor was required to obtain judicial approval prior to presenting evidence gained through the interceptions to the federal grand jury for the purpose of obtaining indictments on federal offenses. The relevant federal statute provides:

> When an investigative or law enforcement officer, while engaged in intercepting wire or oral communications in the manner authorized herein, intercepts wire or oral communications relating to offenses other than those specified in the order of authorization or approval, the contents thereof, and evidence derived therefrom, may be disclosed or used as

provided in subsections (1) and (2) of this section. Such contents and any evidence derived therefrom may be used under subsection (3) of this section when authorized or approved by a judge of competent jurisdiction where such judge finds on subsequent application that the contents were otherwise intercepted in accordance with the provisions of this chapter. Such application shall be made as soon as practicable.

18 U.S.C. § 2517(5).

Recently, the First Circuit ruled that federal law does not require reference to particular statutory sections in a warrant. *United States v. Smith*, 726 F.2d 852, 865 (1st Cir.1984). In *Smith*, failure of federal authorities to obtain judicial authorization was therefore not fatal where the warrant alleged violations of state laws which contained the same elements, described in the same language, as the federal offenses for which the indictments were returned. *Id.* at 865–66. The court in *Smith* stated that the purpose of section 2517(5), to prevent "subterfuge searches," was not thereby undermined. *Id.* The federal and state offenses at issue in *Smith* were the same ones charged in this case. The prosecutor's failure to obtain judicial approval therefore does not warrant suppression in this case any more than it did in *Smith*. I note, however, that it would be prudent for investigating officers to routinely obtain judicial approval and thus always ensure literal compliance with section 2517(5). *See id.* at 865.

I rule that the interceptions in this case were lawfully conducted and that the tapes may be used as evidence in this Court.

Order accordingly.