821 F.2d 860
 56 USLW 2042
 UNITED STATES of America, Appellee,
v.
Hector MORA, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Franklin VALENCIA, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Jose Alberto VALENCIA, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Luis Fernando BERRIO, Defendant, Appellant.
 Nos. 86-1196, 86-1375 to 86-1377.
 United States Court of Appeals,
First Circuit.
 Argued Feb. 4, 1987.
Decided June 15, 1987.
As Amended June 19, 1987.
 
 Daniel Patrick Leonard with whom James Michael Merberg was on brief, for defendant-appellant Hector Mora.
 John F. Gallagher, for appellant Franklin Valencia submitted on brief of defendant-appellant Mora.
 Jose A. Espinosa, for defendant-appellant Jose Alberto Valencia submitted on brief of defendant-appellant Mora.
 Susan L. Crockin, Federal Public Defender's Office, for defendant-appellant Luis Fernando Berrio submitted on brief of defendant-appellant Mora.
 William H. Kettlewell, Asst. U.S. Atty., with whom Robert S. Mueller, III, U.S. Atty., was on brief, for appellee.
 Before CAMPBELL, Chief Judge, ALDRICH and SELYA, Circuit Judges.
 SELYA, Circuit Judge.
 
 
 1
 These appeals pose a single question--but one of some moment and of novel impression in this circuit. The issue presented centers around the consequences of the government's failure to return and seal tape recordings of wire intercepts "immediately" as required by 18 U.S.C. Sec. 2518(8)(a).
 
 
 2
 * The proceedings before us arise out of a pair of related indictments handed up by a grand jury in the United States District Court for the District of Massachusetts. The first such indictment, returned in May 1985, contained six counts. Inter alia, it charged the defendant-appellant, Hector Mora, with various drug-related offenses. In a subsequent five count indictment brought the following month, Mora and the remaining defendants-appellants, Franklin Valencia, Jose Alberto Valencia, and Luis Berrio, were accused of myriad other offenses related to narcotics trafficking. Certain intercepted wire communications, the genesis of which we will describe shortly with greater exactitude, inculpated the foursome. They moved to prevent the prosecution from using the evidentiary fruits of these overheard conversations against them. Following the district court's refusal to suppress, see United States v. Mora, 623 F.Supp. 354 (D.Mass.1985) (Mora I ), the four appellants tendered conditional guilty pleas. Fed.R.Crim.P. 11(a)(2). Each preserved his right to appeal the district court's failure to quash the disputed evidence.[1] After sentences had been imposed, these appeals ensued.
 
 
 3
 Although the defendants originally contested a medley of matters pertaining to the listen-ins (e.g., the sufficiency of the warrant applications, the validity of the orders authorizing the interceptions, the alleged lack of minimization in the course of the electronic surveillance), they have now conceded these points and narrowed their focus to concentrate strictly and solely on the return and sealing of the tapes. This question stands as a common denominator of each of the appeals. See supra n. 1. We have therefore consolidated the cases, and have permitted the other three appellants to join in Mora's brief and argument.
 
 II
 
 4
 The relevant facts are set forth at some length in the district court's opinion, Mora I, 623 F.Supp. at 355-58, and we refer the reader with a liking for detail to that rescript. We will restate only those basic facts which help to place the issue before us into balanced perspective.
 
 
 5
 In early 1985, the Massachusetts State Police (MSP) began a probe which eventually led to the appellants, among a coterie of others. After a full panoply of standard investigative techniques had been exhausted, the district attorney for Middlesex County designated an assistant, Alexander Z. Nappan, to apply to the state superior court for a warrant authorizing the interception of certain conversations over a particular telephone line. The principal target of this sortie was Juan Guillermo Valencia, a codefendant below. This individual, who allegedly trafficked in narcotics under the nomme de guerre of "GeJarno", was said to use the designated telephone frequently. The application was prepared, approved by the state court, and an order and warrant obtained, all in pursuance of M.G.L. ch. 272, Sec. 99. The electronic surveillance began on March 23, 1985 and continued around the clock for fifteen consecutive days.
 
 
 6
 The procedure was straightforward. The intercepted conversations were simultaneously recorded onto a reel-to-reel tape and three separate cassettes. An MSP trooper was designated as the custodian. Each day, the trooper placed the master recording in a cardboard box, closed the box, and signed it. The box was then sealed within a plastic bag. The fastened bags were kept, originally, at the listening post--which was staffed and guarded twenty-four hours a day. At the conclusion of the fifteen day cycle, the contents were removed and secured in a limited access evidence vault, equipped with an alarm system. The tapes were returned to the state superior court for judicial sealing on April 26, 1985. The warrant was returned at the same time.
 
 
 7
 A few days later, Nappan was again designated to seek an authorization to intercept certain wire communications. This time, Mora's home telephone was the subject of the tap. The application was approved by the state judge on May 3, 1985, and an order and warrant issued on the same day. The operation began on May 7, and continued for a ten day period. The mechanics of snaring, sealing, and preserving the discussions were substantially the same as on the earlier occasion. The original recordings were not presented for judicial sealing until June 26, 1985 (along with the warrant) notwithstanding that this phase of the electronic surveillance ended with the apprehension and arrest of some eighteen suspects, including the present appellants, on May 16, 1985.
 
 
 8
 It is undisputed that, though the investigation was under the aegis of state lawmen throughout, financial support and counsel were procured early on from the federal authorities. As the second round of wiretaps built to a crescendo, a collective accord was reached to prosecute in a federal venue. Thus, federal law must come into play to a meaningful extent.
 
 III
 
 9
 The problem presented by these cases arises from the Commonwealth's failure to achieve strict compliance with the federal laws governing such interceptions, and particularly, with the commands of 18 U.S.C. Sec. 2518(8)(a). That statute declares in pertinent part:
 
 
 10
 The contents of any wire or oral communication intercepted by any means authorized by this chapter shall, if possible, be recorded on tape or wire or other comparable device. The recording of the contents ... shall be done in such a way as will protect the recording from editing or other alterations. Immediately upon the expiration of the period of the order [warrant], or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions.... The presence of the seal provided for by this subsection, or a satisfactory explanation for the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any wire or oral communication or evidence derived therefrom under subsection (3) of section 2517.[2]
 
 
 11
 18 U.S.C. Sec. 2518(8)(a).
 
 
 12
 The government concedes that, in respect to both of these wiretaps, the recordings were not tendered to the state court for judicial sealing "[i]mmediately upon the expiration" of the warrant, as ordained by Sec. 2518(8)(a). And, although this further point is not conceded, we hold (as did the district court) that the measurement of any period of delay in the presentation of the fruits of intercepted communications for judicial sealing is a question of federal law in a federal criminal case, notwithstanding the fact that the communications were gathered in the first instance by state law enforcement personnel under a state court order. See United States v. Vazquez, 605 F.2d 1269, 1275-76 (2d Cir.), cert. denied, 444 U.S. 981 (1979); United States v. Sotomayor, 592 F.2d 1219, 1225-26 (2d Cir.), cert. denied, 442 U.S. 919, 99 S.Ct. 2842, 61 L.Ed.2d 286 (1979); Mora I, 623 F.Supp. at 364.[3]
 
 
 13
 As to the initial string of interceptions, the warrant was implemented on March 22, 1985 and used through April 6, 1985. The recordings were not brought to the state court judge until April 26. The federal district court found that there was a delay in presentment of twenty days. Mora I, 623 F.Supp. at 364. Even if the appropriate time span should be measured, as the government contends, from the date of expiration of the warrant (April 21, 1985) rather than from the date it was last employed--because, the prosecution's thesis runs, the investigation was ongoing and its objectives had yet to be achieved--there was still a lag of five days.[4] The gap in the second set of wiretap proceedings was considerably more pronounced. Use of the second warrant began on May 7, 1985 and ended on May 16, 1985. The United States acknowledges that, inasmuch as this eavesdropping culminated in the arrest and apprehension of the suspects May 16, the span of the delay must be calculated from that date forward. Since the recordings were not proffered for judicial sealing until June 26, the interval amounted to forty-one days.
 
 
 14
 The critical question which these cases pose is whether Sec. 2518(8)(a) necessitates suppression of the evidence because of the government's failure to proffer the tapes "immediately" for judicial sealing. (For ease in reference, we will refer interchangeably to "the tapes" and "the evidence" and terms of like import, meaning to include, wherever the context permits, both the recordings and the evidentiary fruits of those electronic seeds.) The appellants argue that the predominant purposes of the statute can only be served by insistence upon implacable compliance with its terms, and that the plain language of Sec. 2518(8)(a) requires the exclusion of tapes not presented for sealing according to the strict tenor of the law. The government begs to differ. It espouses the view that Sec. 2518(8)(a) was not intended to provide a self-contained suppression remedy and does not mandate automatic embargo of the tapes. It also asserts that, even if the statute is construed as affording an independent basis for scuttling the evidence, such a harsh imposition is unwarranted in the circumstances at bar because the explanation of the delay was "satisfactory." Failing all else, the government argues that the application of an exclusionary sanction is inappropriate in light of United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).
 
 
 15
 In a field littered with divided authorities, and in the absence of any direct precedent in this circuit, the district court chose to follow the approach taken by the Seventh Circuit. See United States v. Angelini, 565 F.2d 469, 471-72 (7th Cir.1977), cert. denied, 435 U.S. 923, 98 S.Ct. 1487, 55 L.Ed.2d 517 (1978). Although it found the explanation for the delays in sealing to be "not satisfactory," Mora I, 623 F.Supp. at 364, the district court refused suppression because "no prejudice has resulted to the defendants from the sealing delays, nor has any tactical advantage accrued to the government." Id. at 366. We take a somewhat different tack, but we reach the same outcome.
 
 
 16
 A. "Untimely" Seals/"Absent" Seals. We begin our analysis with the language of the statute. Section 2518(8)(a) decrees that the "presence of the seal ... or a satisfactory explanation for the absence thereof, shall be a prerequisite" for the use of wiretap evidence. Thus, the statute makes it abundantly clear that a seal is not a necessary desideratum to the admissibility of evidence obtained by the interception of telephone calls; a "satisfactory explanation" for the missing seal will serve. See id. Certainly, it can be argued that the untimely placement of a seal, though out of tune with the statutory imperative, nevertheless means that the seal is present (not absent), thereby eliminating the need for any explanation (satisfactory or otherwise).
 
 
 17
 Such an assertion, in our view, draws the thread of language finer than the fabric of the statute permits. Several courts have concluded that a "satisfactory explanation" is required not only for outright failures to seal (i.e., situations where the tapes have never been sealed) but also for belated sealings (i.e., situations where the tapes have been sealed by the issuing judge, but not "immediately" as Sec. 2518(8)(a) requires). See, e.g., United States v. Badalamenti, 794 F.2d 821, 825 (2d Cir.1986); United States v. Diana, 605 F.2d 1307, 1311 (4th Cir.1979), cert. denied, 444 U.S. 1102, 100 S.Ct. 1067, 62 L.Ed.2d 787 (1980); United States v. Angelini, 565 F.2d at 471-73.
 
 
 18
 We join the courts which have so held. Although as a matter of semantics the contrary argument can be made, such a construction would lead to outlandish results. An untimely seal contravenes the spirit of the statute just as much as a missing seal. And, to elevate the status of a belated seal over that of an absent seal would be tantamount to urging law enforcement to go through the essentially empty charade of making returns hopelessly out of time in order to thwart what Congress, in enacting Sec. 2518(8)(a), manifestly intended to accomplish. Thus, we hold that the "late" sealings which occurred in the course of this investigation triggered the requirement of a "satisfactory explanation."
 
 
 19
 B. Independent Grounds for Suppression. Having held that a tardy seal has no greater legal suasion than no seal at all, we next confront the government's thesis that a transgression of Sec. 2518(8)(a), without more, does not bar the introduction of the evidence obtained in consequence of the breach. This is so, the prosecution argues, because the statute must be read as an adjunct to 18 U.S.C. Sec. 2518(10)(a). The latter section supplies the exclusive suppression remedy available under the wiretap law, the United States contends, so Sec. 2518(8)(a) can provide no independent basis for the exclusion of evidence.
 
 
 20
 To put this assertion in better focus, we describe briefly the relevant statutory provisions. Title III of the Omnibus Crime Control and Safe Streets Act of 1968 (Title III), 18 U.S.C. Secs. 2510-2520, specifies the procedure for judicial approval of wire intercepts in the first place, and for the subsequent use of the evidentiary by-products of such interceptions. Section 2515 furnishes general exclusionary authority and sets the tone and tenor for suppression of such evidence:
 
 
 21
 Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, ... if the disclosure of that information would be in violation of this chapter.
 
 
 22
 18 U.S.C. Sec. 2515. This command must, of course, be read in conjunction with 18 U.S.C. Sec. 2518(10)(a), a provision of Title III defining which "disclosure[s]" are forbidden, ergo, subject to a motion to quash. The statute sets forth the following grounds for suppression:
 
 
 23
 (i) the communication was unlawfully intercepted;
 
 
 24
 (ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or
 
 
 25
 (iii) the interception was not made in conformity with the order of authorization or approval.
 
 
 26
 18 U.S.C. Sec. 2518(10)(a).
 
 
 27
 Although the Supreme Court has not spoken on the interrelationship between Sec. 2518(10)(a) and Sec. 2518(8)(a), the Court has stated, in respect to Sec. 2518(10)(a) itself, that "Congress intended to require suppression where there is failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures...." United States v. Giordano, 416 U.S. 505, 527, 94 S.Ct. 1820, 1822, 40 L.Ed.2d 341 (1974). See United States v. Donovan, 429 U.S. 413, 432-34, 97 S.Ct. 658, 670-71, 50 L.Ed.2d 652 (1977) (not every violation of the statute requires suppression of the wiretap evidence); United States v. Chavez, 416 U.S. 562, 574-75, 94 S.Ct. 1849, 1856, 40 L.Ed.2d 380 (1974) (same). That proposition, however, begs the question before us. After all, Congress explicitly intended that Sec. 2518(10)(a) provide the remedy for the right created by Sec. 2515. See Giordano, 416 U.S. at 528 n. 17, 94 S.Ct. at 1833 n. 17 (explicating the interrelationship between Sec. 2515 and Sec. 2518(10)(a) in the light of legislative history). There is nothing to show that the draftsmen of the legislation intended to fashion any similar interplay with respect to infractions occurring after conversations had been intercepted. Quite the contrary, it was Congress which inserted, in rather plain and austere language, the mandatory requirement that due compliance with the sealing requirement "shall be a prerequisite for the use or disclosure of the contents of any wire or oral communication or evidence derived therefrom...." 18 U.S.C. Sec. 2518(8)(a) (emphasis added).
 
 
 28
 This wording is crystal clear. It leaves no room to waffle. Under the legislative prescription, a violation of the (post-interception) sealing requirement is to be controlled by the exclusionary command of the same statute which imposed the requirement in the first place. The formulation is both forthright and apt. Congress, in the most unambiguous of terms, has built a custom-tailored suppression remedy directly into the very law which it crafted to shape and to govern post-interception usages. In the process, it has implicitly abjured direct recourse to the remedy which it provided for transgressions occurring before or during ongoing wiretap activities. The provision of such an independent exclusionary ground constitutes a permissible policy choice, a choice of the sort which courts must honor. The conclusion, therefore, becomes inescapable that the government, in circumstances such as these, cannot slide the question of suppression vel non onto the more hospitable terrain of Sec. 2518(10)(a). Accord Diana, 605 F.2d at 1312 (Sec. 2518(8)(a) "has its own independent exclusionary provision ... so the exclusionary provisions of Secs. 2515 and 2518(10)(a) need not necessarily control"); United States v. Gigante, 538 F.2d 502, 505-06 & n. 5 (2d Cir.1976) (similar).
 
 
 29
 We hold that, in a case within its ambit, Sec. 2518(8)(a) affords a freestanding basis for suppression, independent of Sec. 2518(10)(a). The proper remediation for a violation of the sealing statute is that which the statute itself provides.
 
 
 30
 C. Satisfactory Explanations. Having concluded that unsealed or late-sealed evidence must pass the built-in test devised by Sec. 2518(8)(a), we proceed to evaluate whether the government has offered a "satisfactory explanation" for the delays which occurred in this case. Before commencing on such an odyssey, however, we think it advisable to place the phrase in a somewhat broader context. Though we have held that the other provisions of Title III do not control suppression in a "sealing" case, see supra Part III(B)--after all, as we have noted, Sec. 2518(8)(a) contains its own exclusionary mechanism--they do, in our judgment, inform a reasoned interpretation of the "satisfactory explanation" term. Accord United States v. Diana, 605 F.2d at 1311-13. At the least, these various sections of the Act should be construed with reference to each other.[5] Given the gloss which the Court has placed on Secs. 2518(10)(a) and 2515, and its clear expression that not every abridgement of the wiretap statute requires suppression of the resultant evidence, see, e.g., United States v. Donovan, 429 U.S. at 432-37, 97 S.Ct. at 670-73; United States v. Chavez, 416 U.S. at 574-75, 94 S.Ct. at 1856, we agree with the Fourth Circuit that the meaning of the excusatory phrase in Sec. 2518(8)(a) ought to be viewed in light of why, and to what extent, immediacy of sealing " 'is a central or functional safeguard in Title III's scheme to prevent abuses....' " Diana, 605 F.2d at 1312 (quoting United States v. Chun, 503 F.2d 533, 542 (9th Cir.1974)). Thus, it will be important to determine " 'whether the purpose which the particular procedure was designed to accomplish has been satisfied in spite of the error.' " Id. (quoting Chun ).
 
 
 31
 Having said this much, we nevertheless decline to adopt the model crafted by the Seventh Circuit in United States v. Angelini, supra, and United States v. Lawson, 545 F.2d 557 (7th Cir.1975), cert. denied, 424 U.S. 927, 96 S.Ct. 1141, 47 L.Ed.2d 337 (1976), and approximated by the Third Circuit in United States v. Falcone, 505 F.2d 478 (3d Cir.1974), cert. denied, 420 U.S. 955, 95 S.Ct. 1339, 43 L.Ed.2d 432 (1975). Angelini, 565 F.2d at 471, typifies the approach. If a sealing delay occurs, the court looks first to whether or not a satisfactory explanation exists. Id. If so, there is no need to suppress the evidence. If, however, the proffered explanation is unsatisfactory, the recordings may still be used so long as "the purposes intended by Congress were fulfilled despite the delay." Id. The Fifth Circuit seems to have gone even further; the court allowed late-sealed tapes of proven integrity to be used by prosecutors without any discussion of the reasons, satisfactory or not, for the two week sealing delay. United States v. Diadone, 558 F.2d 775, 780 (5th Cir.1977), cert. denied, 434 U.S. 1064, 98 S.Ct. 1239, 55 L.Ed.2d 765 (1978). Such approaches, we think, borrow too heavily from the general suppression provisions of Title III. They cede too much influence, in particular, to the lore of Sec. 2518(10)(a)--to the point where the independence of Sec. 2518(8)(a) is undeservedly undermined.
 
 
 32
 When sealing is other than "immediate," we believe that the resultant evidence can be utilized if--and only if--a "satisfactory explanation" for the delay eventuates. Section 2518(8)(a), as we read it, demands such a one-step examination into tardy sealings, rather than the "two-step analysis" which Angelini favored. 565 F.2d at 471. To the extent that factors considered by the Angelini court at the second step are relevant to the inquiry--and some are, e.g., the deliberateness of the transgression, the chasteness of the tapes, the tactical advantages accruing from the error--they must be merged into, and considered as part and parcel of, the solitary question which the statute permits to be asked: whether there is "a satisfactory explanation for the absence" of timely judicial sealing. 18 U.S.C. Sec. 2518(8)(a).
 
 
 33
 In deciding whether or not the government's current explanation is "satisfactory" in the statutory sense, we start by reviewing the several elements which we believe must be weighed in the balance. We look first--and most searchingly--at whether the government has established by clear and convincing evidence that the integrity of the tapes has not been compromised. In our eyes, such a practical, commonsense approach has much to commend it. So long as the underlying purpose of the statute is fulfilled, that assurance is entitled to have some considerable bearing on the adequacy of the explanation offered in connection with an infraction of the sealing requirement. See Diana, 605 F.2d at 1313. After all, the reason for sealing--its purpose and essence--is to protect the authenticity and accuracy of the recordings. Angelini, 565 F.2d at 473; Gigante, 538 F.2d at 507; Falcone, 505 F.2d at 483-84. See also Lawson, 545 F.2d at 564 ("the function of the post-interception procedural requirements is to preserve the integrity of the intercepted conversations and to prevent any tampering or editing of the tapes"); United States v. Sklaroff, 506 F.2d 837, 840 (5th Cir.) (purpose of Sec. 2518(8)(a) "is to safeguard the recordings from editing or alteration"), cert. denied, 423 U.S. 874, 96 S.Ct. 142, 46 L.Ed.2d 105 (1975). In other words, assuming that wiretap evidence has been lawfully collected in the first place, the aim of the legislation is to ensure that the immaculacy of the gathered evidence remains unsullied.
 
 
 34
 We find this purpose to be clearly stated in the statute itself. Congress took great pains, after all, to mandate that the intercepts be accomplished "in such way as will protect the recording from editing or other alterations." 18 U.S.C. Sec. 2518(8)(a). The same tone is struck in the legislative history. The Senate report describing Sec. 2518(8)(a) declares that the statute
 
 
 35
 sets out safeguards designed to insure that accurate records will be kept of intercepted communications.... The recording must be made in such a way as will protect it insofar as possible from editing or alteration. Appropriate procedures should be developed to safeguard the identity, physical integrity, and contents of the recordings to assure their admissibility in evidence.
 
 
 36
 S.Rep. No. 1097, 90th Cong., 2d Sess., reprinted in 1968 U.S.Code Cong. & Admin.News 2112, 2193. Preservation of the integrity of tape recordings, after their creation, was unquestionably a fundamental concern of the drafters of Title III.
 
 
 37
 It is essentially for this reason that courts have most often required the government to prove the genuineness of the tapes, whether as an ingredient of a "satisfactory explanation" or as an adjunct to some other theory under which such evidence has survived suppression. See, e.g., Diana, 605 F.2d at 1315-16 (record examined to ascertain that government "extremely careful" to ensure probity of tapes); United States v. Diadone, 558 F.2d at 780 (noting that "integrity of the interceptions" not shown to have been "disturbed"); Falcone, 505 F.2d at 484 (the "crucial factor" is the integrity of the tapes, which must be proved). The District of Columbia Circuit, in considering a similarly-worded local law analog of Sec. 2518(8)(a), has decreed that the proof must adequately evince that late-sealed tapes remained pristine. United States v. Johnson, 696 F.2d 115, 125 (D.C.Cir.1982). In this circuit, we will require the government to prove, by clear and convincing evidence, that such tapes have not been compromised. Inasmuch as the need for a "satisfactory explanation" only arises when those in charge of the wiretap operation fail to do their homework and to present the tapes for immediate sealing, any doubts about the integrity of the evidence should be laid at law enforcement's doorstep. It would be illogical (and unfair) to ask an accused to prove affirmatively that tampering has occurred. And, the salience of the point makes it eminently reasonable that the government's burden be carried by a higher quantum of proof.
 
 
 38
 Where the prosecution has not shouldered this burden, then no explanation, howsoever compelling otherwise, can be a satisfactory one. Assurances that the tapes have not been compromised are essential to their future use. But, although freedom from adulteration is a necessary part of what the prosecution must show, it is by no means the extent of the proof which we will demand in these circumstances. Standing alone, warranties of driven-snow purity, proven beyond peradventure, will not suffice to constitute a "satisfactory explanation." Having scaled the initial hurdle, the government must then demonstrate that the delay in presenting the tapes for judicial sealing came about in good faith. This requirement, as we envision it, has two aspects. First, the delay must not have caused any cognizable prejudice to the accused. See United States v. McGrath, 622 F.2d 36, 42-43 (2d Cir.1980) (delay satisfactorily explained; "no evidence of prejudice or foul play"); Diadone, 558 F.2d at 780 (defendants not "prejudiced by the delay"); Sklaroff, 506 F.2d at 840 (similar); United States v. Poeta, 455 F.2d 117, 122 (2d Cir.) (lag satisfactorily explained; court notes absence of any claim that "appellant was in any way prejudiced by the delay"), cert. denied, 406 U.S. 948, 92 S.Ct. 2041, 32 L.Ed.2d 337 (1972). The second part of the requirement is that the government prove it did not benefit unfairly from the lapse--most particularly, that no tactical advantage accrued to the prosecution in consequence of the lack of immediacy. See Diana, 605 F.2d at 1316; Angelini, 565 F.2d at 471; cf. Chun, 503 F.2d at 542. Once again, we place the burden squarely upon the government to prove its good faith in these dual terms.
 
 
 39
 The next important factor is the length of any particular delay. McGrath, 622 F.2d at 42-43; Diana, 605 F.2d at 1315. This is, to some extent, a subset of the points already discussed. The longer the delay, the greater looms the danger of adulteration; the longer the delay, the harder it may become to show, say, good faith or the absence of undue prejudice. And the lengthier the delay, the more difficult to find the government's explanation "satisfactory."[6] Frequency, too, may be a factor; the more often the requirements are flouted, the greater the likelihood that a party's rights will unfairly be jeopardized.
 
 
 40
 Last, we look at the cause of the delay. We ask, among other things, was the statutory requirement ignored deliberately or inadvertently? We recognize that, in some extreme cases, the reason for the holdup may militate against granting special dispensation to the government. An explanation is unlikely to be deemed satisfactory if it is reflective of gross dereliction of duty or wilful disregard for the sensitive nature of the activities undertaken by means of the order. The rights of the targets of the investigation are deserving of consideration and cannot be overlooked. And, there will be a point at which suppression may become particularly attractive as a means of deterring unwholesome prosecutorial zeal. On the other hand, if the cause of the delay is inoffensive--for example, if the retardment was realistically beyond the control of the law enforcers, or arose out of honest mistake--the stature of the explanation may be enhanced (or at least, not diminished).
 
 
 41
 Although we have set out what we view as the most critical integers of the equation, we stress that there is no stock formula by which the adequacy of an explanation can invariably be gauged. Our enumeration of criteria is not intended to be an exclusive one: some of the elements which we have singled out may overlap, some may not have universal application, and--in specific cases--other things may loom large. The trial judge must scrutinize these situations case by case, giving due weight to the factors which we have mentioned and to any other material which bears upon the reasonableness of the conduct under the circumstances then obtaining. Doubts are to be resolved against the government. It must, as we have said, carry the burden of proving the continued integrity of the tapes by clear and convincing evidence. If it fails to do so, the inquiry is at an end. And, even if the court is satisfied that the evidence is unsullied, the government must yet prove, by a fair preponderance, that the explanation for the delay, taken in all its aspects, is otherwise satisfactory.
 
 IV
 
 42
 We are conscious that the district court, forced by conflicting precedent to guess at the dispositive criteria, approached its factfinding chores with a somewhat different yardstick in hand. Yet, we have no occasion to return the cases to the court below. As matters turn out, the district court, in its thorough treatment of the matter, has already made the key findings of fact.[7] It remains for us only to group those findings along the matrix which we have constructed.
 
 
 43
 The integrity of the recordings--those obtained in April and those obtained in May--is not seriously questioned in this case. The district court found "[n]o evidence of any tampering with the tapes," Mora I, 623 F.Supp. at 366, a finding not contested in the course of this appeal. We have scoured the record, searching in vain for any intimation that the content of the tapes was compromised. We can report that there is not a scintilla of evidence to that effect. Despite the fact that the evidence was not seasonably presented for judicial sealing, the reel-to-reel master recordings were kept under high security and in circumstances which betokened their continued integrity. The government proved clearly and convincingly that the intercepts remained unsullied. The nisi prius roll, uncontradicted in this regard, confirms that "the purposes of the sealing requirements were fulfilled in this case." Id. at 365.
 
 
 44
 The second furculum of the test is as easily passed. The district court specifically found "that no prejudice has resulted to the defendants from the sealing delays, nor has any tactical advantage accrued to the government." Id. at 366. These findings are entirely borne out by the record. Hence, there is no colorable basis for questioning the prosecution's good faith.
 
 
 45
 We turn now to the length of the delays. The district court found these gaps to measure twenty days and forty-one days, respectively. Id. at 364. Accepting those findings for the sake of argument,[8] the duration of the lapses is not so great as to require automatic exclusion of the evidence. Indeed, though different courts have viewed the meaning of Sec. 2518(8)(a) through a wide variety of prisms, comparable periods of delay have usually survived appellate scrutiny--so long as the tapes themselves remained unadulterated.[9] Although we eschew rigid adherence to a numeric countdown of the days as outcome-determinative, see supra n. 6, we think it significant that the delays--while disappointing--are noticeably shorter and more modest than those which typically have been held to require exclusion of the evidence. Compare Gigante, 538 F.2d at 504-07 (delays ranged from 8 1/2 months to upwards of 12 months; suppression ordered).
 
 
 46
 The last of the enumerated factors is the cause which led to the lack of immediacy. The reasons underlying these snafus were catalogued by the district court, Mora I, 623 F.Supp. at 364-65, and we need not dwell upon them. They center about Nappan's failure to understand his responsibilities under the federal statute and his preoccupation with other (unrelated) trials. The record confirms the district judge's assessment that, in responding sluggishly to his (and derivatively, the prosecution's) responsibilities vis-a-vis presentation of the evidence for judicial sealing, Nappan "acted in ignorant bliss and negligently but that he was not consciously or deliberately failing to perform his duty, nor was he acting in bad faith." Id. at 365. We do not condone or pardon such conduct, but we cannot condemn it as severely as if a purposeful attempt to evade the law or unfairly to pillory a suspect had transpired. Putting the worst face on things, the delays in this instance came about by honest mistake, negligently rather than intentionally.
 
 
 47
 When all of these facts are filtered through the seine of what comprises a satisfactory explanation in the Sec. 2518(8)(a) sense, we find that the prosecution's use of the evidence was permissible. The government has proven beyond any shadow of a doubt that the integrity of the tapes was unaffected; that Nappan's lassitude neither benefitted the prosecution nor disadvantaged the defense; and that there was no deliberate flouting of the law. Under the totality of the circumstances, and mindful of the district court's (supportable) finding that Nappan and the MSP acted throughout in the best of faith, there was insufficient cause to suppress the recordings or their evidentiary fruits. Although the question is close--because of the length of the delays and the relative weakness of the reasons for them--the explanation for the laggardness limps successfully past the finish line.
 
 V
 
 48
 We conclude that 18 U.S.C. Sec. 2518(8)(a) applies not only to missing seals, but to untimely seals as well. The statute contains a built-in suppression mechanism which operates independent of, though in pari materia with, 18 U.S.C. Secs. 2515, 2518(10)(a). Where, as here, belated sealings are at issue, the independent exclusionary remedy of the sealing statute, Sec. 2518(8)(a), will go into effect unless the prosecution can put forward a satisfactory explanation for the lack of immediacy.
 
 
 49
 In our view, such an explanation invariably embodies proof, by clear and convincing evidence, that the tapes have not been tampered with, edited, or spoiled in any way. Beyond such proof, the adequacy of the government's explanation must take into account factors such as whether or not those objecting to the evidence have been harmed by the sealing delay; whether or not the prosecution has gained some unfair tactical advantage attributable to noncompliance; the length and frequency of the delays; and the underlying reason for the untimely presentment.
 
 
 50
 In this instance, we find the government's explanation of the sealing delays to have been sufficient. We note, once again, that the tapes were unsullied, the defendants not prejudiced, the prosecution not advantaged, the lack of immediacy not contumaciously generated, and the interval not outrageous. The district court did not err in refusing to suppress the contested evidence. And having so concluded, we find it unnecessary to reach the appellee's alternate contention that it should have been allowed to use the tapes in any event on the authority of United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).
 
 
 51
 Affirmed.
 
 
 
 [1]
 Although Mora I, by its terms, dealt only with Mora's motion to suppress in the proceedings anent the May 1985 indictment, the parties to these appeals had stipulated that the district judge's decision would govern the parallel motions filed by various defendants in connection with the June 1985 indictment. The other three appellants fall within this classification. All are similarly situated, Mora included, in that the admissibility vel non of the evidence against each prescinds from precisely the same facts
 
 
 [2]
 18 U.S.C. Sec. 2517(3) is the general authorization-for-use statute concerning intercepted communications. It provides as follows:
 Any person who has received, by any means authorized by this chapter, any information concerning a wire or oral communication, or evidence derived therefrom intercepted in accordance with the provisions of this chapter may disclose the contents of that communication or such derivative evidence while giving testimony under oath or affirmation in any proceeding held under the authority of the United States or of any State or political subdivision thereof.
 18 U.S.C. Sec. 2517(3).
 
 
 [3]
 Massachusetts law does not require immediate sealing, but provides a seven day grace period after the termination of the warrant within which to make a return to the issuing magistrate. See M.G.L. ch. 272, Sec. 99 (M). See also Commonwealth v. Vitello, 367 Mass. 224, 327 N.E.2d 819 (1975). Under state law, the seven day period supplies the "outside limit on return of the warrant...." 367 Mass. at 267, 327 N.E.2d at 844. Generally speaking, insofar as wiretapping is concerned, states are free to superimpose more rigorous requirements upon those mandated by the Congress, United States v. Smith, 726 F.2d 852, 856 (1st Cir.), cert. denied, 469 U.S. 841, 105 S.Ct. 143, 83 L.Ed.2d 82 (1984), but not to water down federally-devised safeguards. For the purposes at hand, there is no untenable conflict between the state scheme and the federal scheme. Id. at 863
 
 
 [4]
 Because the facts of this case, overall, do not require us to reach the problematic question of whether a sealing delay ought to be calculated from the expiration date of the warrant or from such earlier date as the objective of the tap is achieved, we leave that issue for another day. Whether the gap is viewed as comprising twenty days or five days, the legal issue remains much the same. See United States v. Angelini, 565 F.2d 469, 470 n. 3 (7th Cir.1977), cert. denied, 435 U.S. 923, 98 S.Ct. 1487, 55 L.Ed.2d 517 (1978). In either case, the fallow period is substantially less than that which followed in the wake of the second warrant
 
 
 [5]
 To be sure, as the maxim has it, par in parem imperium non habet. Yet, though an equal has no dominion over an equal, sections of a statute passed as a unitary whole, and standing side by side, can--and often do--shed valuable light, one on the other
 
 
 [6]
 In United States v. Massino, 784 F.2d 153, 158-59 (2d Cir.1986), the Second Circuit established a strict protocol for judicial oversight of delays in presentment (beginning with delays of two days or more). The approach which we announce today to the question of what constitutes a "satisfactory explanation" is somewhat different and considerably more flexible. The Massino formulation, we fear, is overly wooden. It suffers, as well, from the same infirmity that the Seventh Circuit discerned in Gigante; by giving little weight to the integrity of the evidence, it "inexplicably elevates the immediate sealing requirement to a more protected status than any of the other procedural requirements enacted in Title III." Angelini, 565 F.2d at 473 n. 7
 
 
 [7]
 As we noted at the outset, the district court, faced with a dearth of direct precedent in this circuit and with a split in authority elsewhere, chose to follow the contours of Angelini, 565 F.2d 469. See Mora I, 623 F.Supp. at 365-66. Although we have fashioned a standard different from the two-step analysis of Angelini, see supra Part III(C), much the same factfinding is necessary for either approach. We differ from the Seventh Circuit less in our determination of what facts must be considered than in our view as to the pattern into which the factual fragments must be arranged
 
 
 [8]
 The twenty day hiatus may overstate the government's lethargy by a multiple of four. See supra n. 4
 
 
 [9]
 See, e.g., Badalamenti, 794 F.2d at 823-25 (delays from 7 to 21 days); Diana, 605 F.2d at 1315 (delay of 39 days); Angelini, 565 F.2d at 470-74 & n. 3 (delays from 9 to 44 days); Diadone, 558 F.2d at 780 (14 day delay); Lawson, 545 F.2d at 564-65 (delay of 57 days); Sklaroff, 506 F.2d at 840 (14 day delay); Falcone, 505 F.2d at 483-84 (delay of 45 days); United States v. Caruso, 415 F.Supp. 847, 850-51 (S.D.N.Y.1976) (delay of 42 days), aff'd mem., 553 F.2d 94 (2d Cir.1977)